**STATE of Tennessee**

v.

**Michael CASPER.**

Supreme Court of Tennessee,
at Nashville.

June 2, 2009 Session.

Nov. 6, 2009.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Laura T. Kidwell, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Barbara Doak and Chad Jackson, Assistant District Attorneys General, for the appellant, State of Tennessee.

Dana C. McLendon III and Ernest W. Williams, Franklin, Tennessee, for the appellee, Michael Casper.

William Harris Farmer, Nashville, Tennessee, for the amicus curiae, North American Securities Administrators Association, Inc.

## OPINION

GARY R. WADE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

The defendant was convicted of fifteen counts of willfully selling securities without registering with the state as a broker-dealer or agent in violation of Tennessee

Code Annotated section 48–2–109. The trial court imposed concurrent sentences of four years on each count, required eleven months to be served in jail, and ordered twelve years of probation, community service, and the payment of fines and restitution. The Court of Criminal Appeals reversed and dismissed the convictions on grounds of insufficient evidence, holding that the term "willfully" in the criminal penalties section of the Tennessee Securities Act of 1980 required that the defendant not only had to act deliberately, but also had to be aware that his conduct was prohibited by law. We adopt the majority rule and hold that the statute does not require the state to prove that the defendant knew his or her acts were illegal in order to establish a willful violation of our state securities laws. The term "willfully" in Tennessee Code Annotated section 48–2–123(a) requires only that the accused acted deliberately and was fully aware of his or her conduct. Because the defendant was aware he was selling securities and knew that he was not registered as a broker-dealer or agent, we reinstate the convictions and the sentences.

## Facts and Procedural History

Michael Casper (the "Defendant") owned Olde South Trust ("Olde South"), a business located in Murfreesboro. In January of 2003, the Securities Division of the Tennessee Department of Commerce and Insurance (the "Department") opened an investigation into Olde South's sale of preferred shares in PhyMed Partners, Inc. ("PhyMed"), a Florida corporation.[1] As a result of the investigation, the Defendant was charged with nineteen counts of sale of securities by an unregistered broker-dealer or agent in violation of Tennessee Code Annotated section 48–2–109 (1995 & Supp.2001). The indictment included allegations that the Defendant had willfully violated section 48–2–109, and thus could be subject to criminal penalties under section 48–2–123(a) (1995 & Supp.2001). The State dismissed three of the counts prior to trial, and the trial court dismissed one count for lack of evidence at the conclusion of the State's proof.

At trial, Robert Heisse, a former examiner in the Securities Division, offered testimony about the scope of the Department's investigation and the conclusions drawn. He stated that the Department discovered that Olde South had sold PhyMed preferred stock to a large number of senior citizens throughout Tennessee. Olde South had made initial contact with these individuals by holding seminars on estate planning, primarily at senior citizen centers and churches, during which its representatives discussed the importance of establishing living trusts. After the seminars, salespersons with the company conducted follow-up visits at the residences of individuals who had requested more information about investment options. During these visits, an Olde South sales representative evaluated the assets of the potential buyer and typically suggested that PhyMed preferred stock would offer a more lucrative source of income. The sales representatives promised a rate of return of approximately twelve percent, to be paid in monthly dividend checks. When the buyers signed the investment documents, Olde South mailed the documentation and purchase price to PhyMed in return for a finder's fee. In the sum-

---

1. While specific to each corporation, preferred stock may have characteristics of both debt (with fixed dividends) and equity (potential appreciation in value), but is defined as "[a] class of stock giving its holder a preferen-

tial claim to dividends and to corporate assets upon liquidation ... that usually carries no voting rights." *Black's Law Dictionary* 1457 (8th ed. 2004).

mer of 2002, when their monthly dividend checks stopped arriving, individuals who had purchased PhyMed preferred shares through Olde South reported their concerns to the Securities Division. Eventually, PhyMed was shut down by federal authorities. Its President and Chief Executive Officer, James Lamar McMichael, was charged with securities fraud and ultimately entered a guilty plea.

Heisse had previously led other investigations into the Defendant's business practices on behalf of the Securities Division. He testified that the Defendant, as the sole owner of Middle Tennessee Trust, a predecessor entity to Olde South, was involved with the sale of unregistered securities in the form of viatical settlements.[2] Upon the completion of that investigation, the Department issued a cease and desist order directing Middle Tennessee Trust to discontinue its sale of unregistered securities and to stop acting as a broker-dealer or broker-dealer agent until registering with the state. Heisse acknowledged that Middle Tennessee Trust complied with the cease and desist order. Heisse also described an investigation that he had conducted in 2000 in connection with the sale of PhyMed promissory notes. As a result of that investigation, the Securities Division petitioned for a cease and desist order against PhyMed and other parties for violations of the Tennessee Securities Act. Although a cease and desist order was not entered against either Olde South or the Defendant as a result of this second investigation, the Defendant, in response to a subpoena, provided sworn testimony by deposition. Both PhyMed and the Defendant quit selling promissory notes after the 2000 investigation and, instead, initi-

ated the sale of PhyMed preferred stock. Heisse testified that the "common theme" between the two prior administrative investigations was that his Department "addressed the sale of unregistered securities and the sale of securities by unregistered parties."

On cross-examination, Heisse conceded that the Defendant had apparently acted under the impression that Olde South could sell PhyMed preferred stock in return for a finder's fee without the stocks being registered. Specifically, the Defendant had claimed that he was not aware that the PhyMed securities required registration because they were being sold under Rule 506 of Regulation D, a "safe harbor" for securities under federal law promulgated by the United States Securities and Exchange Commission ("SEC").

At the conclusion of the Department's investigation into Olde South's sale of PhyMed preferred securities, the Defendant entered into an agreed order in which he admitted that he had engaged in the offer and sale of unregistered securities without being registered by the State as a broker-dealer or agent.

Walter "Bucky" Phillips, who worked as a salesperson for Olde South for approximately five years, confirmed Heisse's account of Olde South's sales strategy with regard to the PhyMed preferred stock. Phillips testified that the Defendant owned the company and made all decisions "as to how things were done, what the investments were and so forth." According to Phillips, the Defendant decided to initiate sales of PhyMed preferred stock in 1999 or 2000, and the stock eventually became a

2. Heisse described viatical settlements as contracts under which third-party investors purchase either an entire life insurance policy or stake in a life insurance policy that has been sold by the policyholder prior to his or her death; when the original policyholder dies, the investor, as the legal beneficiary, receives the death benefit from the policy. According to Heisse, viatical settlements are securities under the Tennessee Securities Act of 1980.

"staple" of the investment products offered by Olde South. He recalled that the Defendant led the "vast majority" of the seminars, which included general presentations on estate planning and specifically addressed the comparison of wills to living trusts. He confirmed that at the conclusion of each seminar, the Olde South staff met with potential investors. Phillips, who first learned of PhyMed through the Defendant, testified that when he reviewed a financial statement and determined that the potential buyer had trust income, he would introduce PhyMed preferred stock as an investment option. He described PhyMed's return of twelve percent on the investment as "a good source of income." Phillips, who had also been indicted for his failure to properly register before selling the securities, acknowledged that he had sold PhyMed stock to individuals whose complaints had led to the prosecution of the Defendant.

Phillips recalled that in the spring and early summer of 2002, "as the PhyMed checks were coming later and later to our clients ... there was growing concern about PhyMed." Nevertheless, the Defendant directed the Olde South sales representatives to sell as much PhyMed preferred stock as they could in order to ensure that PhyMed did not "go under." During this time, Phillips obtained his Series 7 license, which allowed him to sell securities through a registered broker-dealer. Olde South had paid for Phillips to prepare for and take the licensing examination because it had developed another preferred stock that was similar to the one PhyMed was offering, but which required a registered broker-dealer. Because PhyMed was not on the preferred list of the broker-dealers with whom Phillips was working as a licensed broker-dealer agent, he stopped selling PhyMed stock. At the time Phillips testified, he had surrendered his securities license as well as his license to sell insurance products. He planned to plead guilty under a pre-trial diversion program, the terms of which included a probationary period of six years and an agreement to testify truthfully in this proceeding.

Joyce Dutton, the bookkeeper for Olde South from August of 1998 until September of 2001, also testified at trial. While admitting that she was under investigation by the Department for selling securities without a license, she corroborated Phillips' testimony that the Defendant was completely in charge of Olde South and made all of the personnel and salary decisions. Dutton, as Olde South's bookkeeper, was responsible for paying the company's bills as well as scheduling the investment seminars at senior citizen centers and churches. Although she left Olde South before the problems with PhyMed stock materialized, she was aware of the commissions that Olde South paid its representatives, including the Defendant, on the sale of the preferred stock. When the Defendant calculated the sales commissions on the amount of each investment, he decided what percentages to allocate to himself, to the sales representative, and to the company. According to Dutton, Olde South received fourteen percent of the amount of each sale of PhyMed preferred stock, and the Defendant allocated between six and eight percent to himself.

Dutton's successor, Julie Pyatt, who served as Olde South's bookkeeper from October of 2001 to September of 2002, testified that the percentage of the sales commission on PhyMed stock that was designated for the Defendant was not paid directly. Rather, the commissions were paid to Stephens Consulting, which she understood to be "a consulting company that was opened by [the Defendant] ... to do all of his income and expenses that

were associated with his consulting work ... for Olde South Trust." Pyatt stated that the Defendant received his salary from Stephens Consulting rather than Olde South.

Eight individuals who attended Olde South investment seminars and subsequently acquired PhyMed stock also testified for the State. One of the investors, William Beachboard, became acquainted with Phillips at his church, where Phillips served as head of the music department. Beachboard's wife, Marilyn, stated that she and her husband lacked significant investment experience and had relied upon Phillips' advice that PhyMed preferred stock would be a safe investment. Brenda Holdren, who was not an experienced investor and who testified that she and her husband's net worth was less than $250,000, learned about Olde South when "[t]hey had a ... meeting at our church to talk about setting up trusts for your assets and so on." Stacy Harris, who had asked for more information while filling out an Olde South questionnaire during a seminar at her church in January of 2002, testified that the Olde South representatives "sang songs" during the seminar and prayed. She specifically recalled discussions about investment options and trusts. The questionnaire bore Olde South's name and logo on the top line with the subtitle "A Ministry of Caring and Sharing." Other investors also testified that Phillips or other representatives of Olde South had promised them a return on the PhyMed preferred stock of eleven or twelve percent. The investors stated that they received only a few checks from PhyMed before the payments stopped. The testimony further established that Joyce Dutton, several of Dutton's relatives, Bucky Phillips' mother, and the Defendant's parents also purchased PhyMed preferred stock.

Cora Alston also testified for the State. At the time of trial, Alston had worked in the Securities Division for thirty-one years and served as Chief of Securities Registration for the last eight of those years. She testified "that in order to sell a security in Tennessee it must be registered or you must rely upon an exemption or you must provide a notice [of] filing." *See* Tenn. Code Ann. § 48–2–104 (2002). According to Alston, the purpose of this provision is to protect investors. She stated that PhyMed stock was sold in 2000 and 2001 pursuant to a notice of filing, and was purported to be sold by the issuer, PhyMed, under Rule 506 of Regulation D. *See* 17 C.F.R. § 230.506(b) (Westlaw 2009). Alston explained, however, that a Rule 506 offering is one sold to potential investors who have some degree of sophistication, meaning that they "know[ ] what is involved in that investment or ... have ... the capability of knowing persons such as accountants or lawyers that can advise them on that particular offering." Alston stated that the individual who sells the security must be registered under Tennessee Code Annotated section 48–2–109, regardless of whether the security itself is registered, exempt, or offered pursuant to a notice of filing.

Larry Burton, a section chief for securities broker-dealer and securities-agent registration and regulation for the Securities Division, also testified at trial. He described, in layman's terms, the different categories of registrations for individuals and entities offering securities, including: (1) broker-dealers (companies that engage in the business of effecting securities transactions for the account of others); (2) broker-dealer agents (individuals who act on behalf of broker-dealers); (3) investment advisers (firms that offer advice regarding securities); and (4) investment adviser representatives (individuals who act

on behalf of investment advisers).[3] Burton described the action of a broker-dealer in effecting a securities transaction as follows:

> The broker[-]dealer will match up often an issuer of securities and an investor, a person who wants to buy interest in an issuer's offering. The broker[-]dealer is neither the issuer nor the customer. In that instance they are a third party and they are obliged to take a look at the issuer's offering, take a look at the investor, determine whether the security is suitable for the investor based on the investor's stated investment objectives and then will participate in effecting the transaction which is the exchange of the security that's issued by the issuer or in a secondary market transaction and collecting money from the issuer and conveying it to the issuer.

He characterized a broker-dealer agent as "the human contact for the investor who will discuss the investor's investment objectives, collect money, convey information relating to the security and complete the transaction on behalf of the broker[-]dealer." Burton testified that broker-dealer agents must register as such in Tennessee whenever they are "involved in promoting and effecting the sale of a security on behalf of the broker[-]dealer" or otherwise supervising such sales. Burton confirmed that neither Olde South nor the Defendant had registered as either broker-dealers or broker-dealer agents under the Tennessee Securities Act. Burton further observed that banks, trust companies, and insurance companies that are styled as "institutional investors" are exempt from registration. He testified, however, that a company does not qualify for the exemption simply by using the word "trust" in its name but must actually be registered as a trust com-

pany. Olde South Trust was not so registered.

The Defendant did not testify. The only proof he offered was the testimony of his father, Phillip Casper, who stated that he and the Defendant's mother had invested in PhyMed. At the conclusion of the trial, the jury returned guilty verdicts on each of the remaining fifteen counts in the indictment. The trial court sentenced the Defendant to four years on each count, to be served concurrently, but imposed an effective alternative sentence of eleven months in the county jail and twelve years of probation, plus one thousand hours of community service and payment of fines and restitution totaling $143,500.

On direct appeal, the Court of Criminal Appeals reversed and dismissed the convictions, holding that to "willfully violate" the Tennessee Securities Act, the accused must do "something more than intentionally sell[ ] securities without properly registering as a broker-dealer under section 48–2–109." *State v. Casper,* No. M2006–02538–CCA–R3–CD, 2008 WL 2648954, at *10 (Tenn.Crim.App. July 3, 2008). Our intermediate appellate court ruled that the

> distinction between criminal and noncriminal offenders means that the legislature intended only to criminalize the selling of securities by an unregistered broker-dealer when the person selling the securities is aware that his or her conduct is prohibited by Tennessee Code Annotated section 48–2–109, and yet nevertheless intentionally sells the security knowing he or she is violating the law.

*Id.* This Court granted the State's application for permission to appeal to consider whether the statute requires proof that an unregistered seller of securities was aware that the sale is prohibited.

---

**3.** *See* Tenn.Code Ann. § 48–2–102(3), (4), (10) & (11) (Supp.2009).

## Standard of Review

 Initially, the issues presented for review require us to construe the relevant provisions of the Tennessee Securities Act and apply that interpretation to the facts of this case. Issues of statutory construction are reviewed de novo with no presumption of correctness afforded to the determinations of the lower courts. *Hayes v. Gibson County,* 288 S.W.3d 334, 337 (Tenn.2009). In interpreting a statute, we "must first ascertain and then give full effect to the General Assembly's intent and purpose" in drafting those sections. *Waldschmidt v. Reassure Am. Life Ins. Co.,* 271 S.W.3d 173, 176 (Tenn.2008). Our chief concern is to carry out the legislature's intent without unduly broadening or restricting the statute. *Houghton v. Aramark Educ. Res., Inc.,* 90 S.W.3d 676, 678 (Tenn.2002) (quoting *Owens v. State,* 908 S.W.2d 923, 926 (Tenn.1995)). We presume that every word in a statute has meaning and purpose and should be given full effect if so doing does not violate the legislature's obvious intent. *In re C.K.G.,* 173 S.W.3d 714, 722 (Tenn.2005). When the statutory language is clear and unambiguous, we simply apply its plain meaning. *Eastman Chem. Co. v. Johnson,* 151 S.W.3d 503, 507 (Tenn.2004). When a statute is ambiguous, however, we may refer to the broader statutory scheme, the history of the legislation, or other sources to discern its meaning. *Colonial Pipeline Co. v. Morgan,* 263 S.W.3d 827, 836 (Tenn. 2008). We presume that the General Assembly was aware of its prior enactments and knew the state of the law at the time it passed the legislation. *Owens,* 908 S.W.2d at 926.

 In considering a sufficiency of the evidence question on appeal, we must afford the State the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from the evidence. *State v. Hanson,* 279 S.W.3d 265, 274 (Tenn.2009) (quoting *State v. Vasques,* 221 S.W.3d 514, 521 (Tenn.2007)). "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *Id.* (quoting *State v. Campbell,* 245 S.W.3d 331, 335 (Tenn.2008)). The relevant question when the sufficiency of the evidence is challenged is whether a rational trier of fact, after having reviewed the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. *See* Tenn. R.App. P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict lies with the criminal defendant, because the verdict of guilt removes the presumption of innocence and raises a presumption of guilt. *State v. Evans,* 838 S.W.2d 185, 191 (Tenn.1992). "This standard is the same whether the conviction is based upon direct or circumstantial evidence." *Hanson,* 279 S.W.3d at 275 (quoting *State v. Sutton,* 166 S.W.3d 686, 689 (Tenn.2005)). Where direct evidence is absent, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State,* 505 S.W.2d 237, 241 (Tenn.1973); *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451, 456–58 (1958).

## Background

State laws regulating both the registration of securities and persons engaging in securities transactions pre-exist their federal counterparts. Kansas enacted the first state "blue sky law" in 1911.[4] By

---

4. The term "blue sky law" is traced to Justice Joseph McKenna's mention of a previous

1913, ten other states, including Tennessee, had adopted aggressive legislation closely matching the Kansas statute. Jonathan R. Macey & Geoffrey P. Miller, *Origin of the Blue Sky Laws*, 70 Tex. L. Rev. 347, 377–78 (1991); *see* Act of Sept. 27, 1913, ch. 31, 1913 Tenn. Pub. Acts 500 ("1913 Securities Act"). All of the states in this first wave of reform shared the characteristics of strong agrarian interests and a lack of a significant banking and investment industry. Macey & Miller, 70 Tex. L. Rev. at 352, 380. By the time the federal government enacted the Securities Act of 1933 and the Securities Exchange Act of 1934, however, nearly every state had adopted a blue sky law in some form.

The blue sky laws were the sole means of regulating securities in this country prior to federal securities legislation, and Congress has explicitly refused to preempt the state blue sky laws. *King v. Pope*, 91 S.W.3d 314, 319 (Tenn.2002) (citing 15 U.S.C. § 77r (2002)). The parallel systems of securities regulations "were adopted to serve different purposes. Like Tennessee, states enacted securities regulation to protect investors. Federal securities regulations, on the other hand, were enacted to serve the broader purpose of protecting the integrity of the increasingly nationalized market." *Id.* at 319–20 (citations omitted); *compare* Tennessee Securities

Act of 1980, ch. 866, § 25, 1980 Tenn. Pub. Acts 1170, 1228 ("1980 Securities Act") (stating that the general purpose of the act is to protect investors) *with* 15 U.S.C. § 78b (2009) ("[T]ransactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto . . . .").

The 1913 Securities Act was repealed almost entirely by the adoption of the Securities Act of 1955, which was a modified version of a uniform act set forth in 1951 by the Investment Bankers Association of America. *Green v. Green*, 293 S.W.3d 493, 505 (Tenn.2009) (citing Robert F. Miller, *Procedures Under the Tennessee Securities Law*, 28 Tenn. L. Rev. 303, 304 (1961)); *see* Securities Act of 1955, ch. 143, 1955 Tenn. Pub. Acts 521 ("1955 Securities Act"). In addition to requiring securities and dealers in securities to be registered with the state, the 1955 Act imposed penalties for fraudulent violations of the Act. Miller, 28 Tenn. L. Rev. at 304. Specifically, the 1955 Securities Act made it a misdemeanor to "willfully violate any provisions of this Act" and a felony to "willfully engage in a fraudulent practice declared unlawful" elsewhere in the Act.[5] § 16, 1955

case, left uncited, which remarked that the evil at which such state laws were aimed included "speculative schemes which have no more basis than so many feet of 'blue sky.'" *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550, 37 S.Ct. 217, 61 L.Ed. 480 (1917). Another theory is that the name originated in Kansas, which in the early twentieth century "became the hunting ground of promoters of fraudulent enterprises . . . so barefaced that it was stated that they would sell building lots in the blue sky in fee simple." Louis Loss & Edward M. Cowett, *Blue Sky Law* 7 n. 22 (1958); *see also* Paul G. Mahoney, *The Origins of the Blue-Sky Laws: A Test of Competing Hypotheses*, 46 J.L. & Econ. 229, 229 (2003).

5. Section 13 of the 1955 Securities Act declared it a fraudulent practice (1) to "knowingly . . . subscribe to, or make or cause to be made, any material false statement or representation in any . . . document or statement required to be filed under any provision of th[e] Act; or" (2) "to employ any device, scheme or artifice to defraud" or "engage in . . . a fraud or deceit upon [a] purchaser or seller" of securities in connection with a securities transaction in the state. 1955 Tenn. Pub. Acts at 554–55 (codified as amended at Tenn.Code Ann. § 48–1644 (1979)).

Tenn. Pub. Acts at 558. The word "willfully" was removed from this criminal penalties provision of the 1955 Securities Act by a 1959 amendment. Act of Mar. 12, 1959, ch. 28, § 7, 1959 Tenn. Pub. Acts 679, 685 (codified as amended at Tenn.Code Ann. § 48–1648 (1979)).

In 1956, only one year after Tennessee substantially overhauled its securities laws, the National Conference of Commissioners on Uniform State Laws adopted the first Uniform Securities Act. *Green*, 293 S.W.3d at 505. The 1956 Act, which was amended in 1958, contains separate sections identifying criminal penalties and civil liabilities. Unif. Sec. Act. §§ 409–10 (1956 amended 1958), 7C U.L.A. app. I 748, 873, 888 (2006). Tennessee joined the majority of states by adopting the 1956 Uniform Securities Act through the enactment of the 1980 Securities Act. 1980 Tenn. Pub. Acts 1170 (codified as amended at Tenn.Code Ann. § 48–2–101 to –126 (2002 & Supp. 2009)). The 1980 Securities Act contains a section describing criminal penalties under the Act that is quite similar to the corresponding section in the 1956 Uniform Securities Act.[6] *Compare* § 23(a), 1980 Tenn. Pub. Acts at 1225–26 *with* Unif. Sec. Act. § 409(a), 7C U.L.A. app. I at 873. The legislature also included a policy statement within the 1980 Securities Act, directing that "[t]he Act shall be so construed as to effectuate its general purpose to protect investors, to coordinate the interpretation and administration of this Act with related federal and state regulation, and to require full and fair disclosure in all securities transactions." § 25, 1980 Tenn. Pub. Acts at 1228.

The section of our state securities laws authorizing criminal prosecutions for violations of those laws currently states as follows:

> Any person who willfully violates any provision of this part or who willfully violates any rule or order under this part commits a Class D felony. No person may be imprisoned for the violation of any rule or order if the person proves that the person had no actual knowledge of the rule or order.

Tenn.Code Ann. § 48–2–123(a) (2002). This section is nearly identical to the version that the legislature adopted in 1980. § 23(a), 1980 Tenn. Pub. Acts at 1225. The only amendments to the statute have been to adopt the classification of offenses under the Criminal Sentencing Reform Act of 1989 and to increase the range of punishment to a Class D felony. *State v. Ricci*, 914 S.W.2d 475, 478 (Tenn.1996); *see* Act of May 24, 1989, ch. 591, § 42, 1989 Tenn. Pub. Acts 1169, 1353; Act of Apr. 23, 1996, ch. 1072, § 3, 1996 Tenn. Pub. Acts 915, 915.

## Analysis

The Defendant, who admits that he engaged in the sale of PhyMed preferred securities, claims that because he believed that the PhyMed shares that he and Olde South had sold were exempt under federal law (specifically, Rule 506 of Regulation D) and, therefore, did not need to be registered in this state, he should not be held culpable for failing to register as a broker-dealer or broker-dealer agent. The Defendant contends that because he understood that Olde South could be compensated by PhyMed through finder's fees for the facilitation of sales of the preferred stock, he did not have actual knowledge that he was violating Tennessee Code An-

---

**6.** The Uniform Securities Act was amended in 1985 and 2002. *See* Unif. Sec. Act. (1985 amended 1988), 7C U.L.A. 215 (2006); Unif. Sec. Act. (2002), 7C U.L.A. 1 (2006). Tennessee, however, did not adopt the 1985 revised Uniform Securities Act and has not adopted the 2002 Act.

686

notated section 48–2–109. In its application for permission to appeal, the State asserted that the Court of Criminal Appeals, by reversing the convictions on the grounds of insufficient evidence, erred in two ways: first, by confusing the requirements of Tennessee Code Annotated sections 48–2–104 and 48–2–109, and second, by incorrectly construing the term "willfully" in Tennessee Code Annotated section 48–2–123(a).

## I. Registration Requirements of Sections 48–2–104 and 48–2–109

■ The State takes exception to the observation by the Court of Criminal Appeals that "[a]n agent selling a Regulation D 506 security does not have to be registered in the State of Tennessee as a broker-dealer or agent." *Casper*, 2008 WL 2648954, at *3. The State claims that this comment "implicitly" holds that Tennessee Code Annotated section 48–2–109 permits an individual or entity to sell securities without registering as a broker-dealer or agent, so long as the securities they are selling are exempt from registration under Tennessee Code Annotated section 48–2–104.

As an initial matter, it is not at all clear that the preferred shares of PhyMed stock were qualified to be sold under Rule 506 of federal Regulation D. An issuer offering securities privately through Regulation D does not have to register its securities with the SEC or file the necessary reports corresponding with registration. Rule 506 of Regulation D permits an issuer to raise an unlimited amount of capital for its private

offering if it meets certain requirements, including selling its securities only to "accredited investors," as so defined in Rule 501 of Regulation D, and up to thirty-five other purchasers. 17 C.F.R. § 230.506(b); *see* 17 C.F.R. § 230.501(e)(1)(iv). Any non-accredited investor who acquires a security offered pursuant to Rule 506 must be "sophisticated," meaning that he "either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment." [7] 17 C.F.R. § 230.506(b)(2)(ii); *see also* U.S. Securities and Exchange Commission, Rule 506 of Regulation D, http://www.sec.gov/answers/1%Frule506.htm (last visited Sept. 8, 2009).

The several individuals who purchased PhyMed preferred stock from Olde South testified at trial that they were neither sophisticated nor experienced investors and had relied entirely upon the advice of the Olde South representatives in making the decision to invest. Nothing in the record suggests that PhyMed, the issuer, reasonably believed prior to the sales of its preferred stock that these individuals, either alone or together with personal representatives, qualified as either accredited investors as defined in Rule 501 of Regulation D or sophisticated non-accredited investors. [8]

Even assuming that the PhyMed preferred shares were properly classified as exempt from registration under Tennessee Code Annotated section 48–2–104(a), the statutory language of Tennessee Code An-

7. As noted, Alston, the Chief of Securities Registration, testified that potential investors in a Regulation D, Rule 506 offering should "know[ ] what is involved in that investment or ... have ... the capability of knowing persons such as accountants or lawyers that can advise them on that particular offering."

8. The definition of "accredited investor" under Tennessee's blue sky law tracks the definition in Rule 501 of Regulation D. Tenn.Code Ann. § 48–2–102(1).

notated section 48–2–109(a) establishes that a person selling an exempt security must be registered as a broker-dealer or agent. Sections 48–2–104(a) and –109(a), while closely related, serve different purposes. Section 48–2–104(a) states that it is unlawful for any person to sell securities in Tennessee unless: (1) the security is registered; (2) the security or transaction is exempt under section 48–2–103; or (3) the security is a covered security. Tenn.Code Ann. § 48–2–104(a). Conversely, section 48–2–109(a), the provision under which the Defendant was convicted, states that "[i]t is unlawful for any person to transact business from or in this state as a broker-dealer or agent unless such person is registered as a broker-dealer or agent under this part." Tenn.Code Ann. § 48–2–109(a) (2002 & Supp.2009). Section 48–2–104(a) regulates the security, while section 48–2–109(a) regulates the individual or entity transacting in the security. Furthermore, the definitions of "broker-dealer" and "agent" in the state securities laws, Tenn. Code Ann. § 48–2–102(3)–(4), make no exceptions for individuals transacting in certain types of securities, and the list of the provisions that may be avoided if the security is exempt from registration, see Tenn. Code Ann. § 48–2–103(a) (2002 & Supp. 2009), includes sections 48–2–104 and 48–2–113, but not section 48–2–109. The registration requirement for broker-dealers and broker-dealer agents in section 48–2–109(a), therefore, cannot be avoided simply because the securities that the individual

or entity is selling are exempt from registration under section 49–2–104.[9]

In our view, the Court of Criminal Appeals incorrectly stated that an individual selling a security that is exempt from the registration requirements of section 48–2–104(a) need not register as a broker-dealer or broker-dealer agent pursuant to section 48–2–109(a). Because the requirements of the two provisions are distinct, an exemption under one does not guarantee, or even suggest, an exemption under the other. Our resolution of this issue is not dispositive, however, because even if the Defendant violated section 48–2–109(a) by selling securities without registering with the state as a broker-dealer or broker-dealer agent, he could be found criminally liable for such violations only if his violations were willful.

## II. Interpretation of "Willfully" in Section 48–2–123(a)

The trial court instructed the jury that in order to find the Defendant guilty of the unlawful sale of securities by an unregistered broker, dealer, or agent under Tennessee Code Annotated section 48–2–109, the state must have proved beyond a reasonable doubt the following three elements: "1.) That the defendant transacted business as a broker, dealer, or agent, to wit: securities; and 2.) That the defendant was not properly registered as a broker, dealer, or agent; and 3.) *That the defendant did so willfully.*" (Emphasis added.) The trial court, describing "willfully" and

9. This construction of the statute is further supported by the testimony at trial. Alston testified that while Regulation D, Rule 506 offerings may in fact be exempt from registration under sections 48–2–103 and –104, this exemption affects only the security itself, not section 48–2–109's requirement that the individual or entity selling the security be properly registered. Larry Burton, who confirmed that some "institutional investors" (i.e.,

banks, trust companies, and insurance companies) are exempt from section 48–2–109's registration requirement, provided unrefuted testimony that Olde South was not registered as a trust company. The record, therefore, establishes that neither the Defendant nor Olde South qualified for an exemption from the registration requirement of section 48–2–109.

"intentionally" as synonymous terms, instructed the jury as follows: " 'Intentionally' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *See* Tenn.Code Ann. § 39–11–302(a) (2003). The Defendant argued that the trial court's definition of the term "willfully," as it appears in Tennessee Code Annotated section 48–2–123(a), was erroneous, and our Court of Criminal Appeals agreed, holding that to willfully violate section 48–2–109, an unregistered broker-dealer must not only sell securities, but also be aware of the illegality of his or her conduct. That conclusion, however, was based, in part, upon two opinions of the United States Supreme Court that construed the term "willfully" outside the securities context. *See Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). Each of those rulings are distinguishable from the circumstances at issue in this case.

## A. Construing "Willfully" in Other Contexts

The word "willfully" is not defined in the 1980 Securities Act, and this Court has never interpreted the meaning of the term as used in section 48–2–123(a). Unlike the terms in the 1980 Securities Act which we recently were called upon to interpret in *Green v. Green,* 293 S.W.3d 493, the term "willfully" in section 48–2–123(a) does not have a plain meaning. As observed in *Konvalinka v. Chattanooga–Hamilton County Hospital Authority,* 249 S.W.3d 346, 357 (Tenn.2008), "[t]he word 'willfully' has been characterized as a word of many meanings whose construction depends on the context in which it appears." *See also Spies v. United States,* 317 U.S. 492, 497,

63 S.Ct. 364, 87 L.Ed. 418 (1943). For example, in the parental termination context, we recently held that "a parent's failure to visit is willful when it is simply 'the product of free will, rather than coercion,' " and that a parent need not be apprised of all of the legal consequences of his failure to visit for that failure to be willful. *In re M.L.P.,* 281 S.W.3d 387, 392 (Tenn.2009) (quoting *In re Audrey S.,* 182 S.W.3d 838, 863 (Tenn.Ct.App.2005)). Conversely, we have held that an employee's "willful misconduct" under Tennessee's workers' compensation law consists of three elements: "(1) an intention to do the act, (2) *purposeful violation of orders,* and (3) an element of perverseness." *Rogers v. Kroger Co.,* 832 S.W.2d 538, 541 (Tenn.1992) (emphasis added); *see also Wright v. Gunther Nash Mining Constr. Co.,* 614 S.W.2d 796, 798 (Tenn.1981) (observing that in Tennessee, the "willful misconduct" defense has largely been limited to situations where the employee deliberately and intentionally violates known regulations).

■ When incorporated into criminal statutes, "willfully" generally "connotes a culpable state of mind," and "a willful act is one undertaken for a bad purpose." *Konvalinka,* 249 S.W.3d at 357; *see also Bryan v. United States,* 524 U.S. 184, 191–92, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998). Even this definition, however, often defies clear understanding and depends heavily upon context. The United States Supreme Court has observed that when used in a criminal statute, "willfully" can mean "an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely. The word is also employed to characterize a thing done without ground for believing it is lawful, or conduct marked by careless disregard whether or not one has the right so to act." *Bryan,* 524 U.S. at 191 n. 12, 118 S.Ct. 1939

(quoting *United States v. Murdock*, 290 U.S. 389, 394–95, 54 S.Ct. 223, 78 L.Ed. 381 (1933) (citations omitted)). *Black's Law Dictionary* provides little additional help, as it defines "willful" as "[v]oluntary and intentional, but *not necessarily* malicious." *Black's Law Dictionary* 1630 (8th ed. 2004) (emphasis added). The entry for "willful" in the Eighth Edition of *Black's Law Dictionary* incorporates a quotation from a criminal law treatise that identifies the difficulty in determining a clear definition for the term:

> The word "wilful" or "wilfully" when used in the definition of a crime, it has been said time and again, means only intentionally or purposely as distinguished from accidentally or negligently and does not require any actual impropriety; while on the other hand it has been stated with equal repetition and insistence that the requirement added by such a word is not satisfied unless there is a bad purpose or evil intent.

*Id.* (quoting Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 875–76 (3d ed. 1982)).

In some cases, then, such as the two opinions upon which our Court of Criminal Appeals relied, courts have held that the addition of the word "willfully" to a statute requires that the government prove that the accused acted with knowledge that his conduct was unlawful. In other contexts, however, courts have stated that " 'willfully' refers to consciousness of the act but not to consciousness that the act is unlawful." *Cheek*, 498 U.S. 192, 209, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) (Scalia, J., concurring); *see Am. Sur. Co. of N.Y. v. Sullivan*, 7 F.2d 605, 606 (2d Cir.1925) (Hand, J.) ("The word 'willful,' even in criminal statutes, means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.").

The cases we have cited illustrate that context is essential to determining the statutory meaning of the words "willful" or "willfully." A review of the federal statutes at issue in *Cheek* and *Ratzlaf* demonstrates that they are distinguishable from the criminal penalties provision of the 1980 Securities Act. We are not, therefore, persuaded that those decisions provide guidance in our interpretation of Tennessee Code Annotated section 48–2–123(a).

*Cheek* was convicted for income tax evasion and failure to file income tax returns. The federal statutes required that the acts be done "willfully." 498 U.S. at 193, 111 S.Ct. 604 (quoting 26 U.S.C. §§ 7201, 7203). Cheek argued that the willfulness requirement had not been met because he had a good-faith belief that the income tax laws were unconstitutional as applied to him and thus did not impose any legal duty of which he was aware. *Id.* at 204, 111 S.Ct. 604. The Supreme Court observed that the proliferation of income tax statutes and regulations had made it difficult for the average citizen to know and understand his duties under those laws and, in consequence, Congress had "softened the impact" of the criminal statutes "by making specific intent to violate the law an element of certain federal income tax offenses." *Id.* at 199–200, 111 S.Ct. 604. In the context of the federal criminal tax laws, the Court reaffirmed that "the standard for the statutory willfulness requirement is the 'voluntary, intentional violation of a known legal duty.' " *Id.* at 201, 111 S.Ct. 604 (quoting *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976)). Applying this standard, the Supreme Court held that Cheek's asserted beliefs did not have to be "objectively reasonable" in order to be considered by the jury in determining

whether he had acted willfully. *Id.* at 206–07, 111 S.Ct. 604.

In the other case relied upon by the Court of Criminal Appeals, Ratzlaf attempted to pay his gambling debt to a Reno, Nevada casino with $100,000 in cash. 510 U.S. at 137, 114 S.Ct. 655. After being informed that all cash transactions in excess of $10,000 had to be reported to state and federal authorities, Ratzlaf purchased a series of cashier's checks from several different banks in the vicinity, all of which were less than $10,000. *Id.* Based upon this, Ratzlaf was convicted of violating both 31 U.S.C. § 5324(3), which prohibited structuring transactions "for the purpose of evading the [federal] reporting requirements," and § 5322(a), which set out criminal penalties for "[a] person willfully violating" § 5324(3). *Id.* at 139–40, 114 S.Ct. 655. On appeal, he asserted that his knowledge of the reporting requirements and his efforts to avoid them were insufficient to support a conviction for "willfully violating" the anti-structuring statute. Ratzlaf contended that the proof had to establish that he was aware that his structuring plan of repayment was illegal. *Id.* at 138, 114 S.Ct. 655. In a 5–4 decision, the Supreme Court determined that because § 5324(3) prohibited structuring transactions "for the purpose of evading the [federal] reporting requirements," the willfulness requirement of § 5322(a) would be mere surplusage if it did not impose some heightened knowledge requirement. *Id.* at 140–41, 114 S.Ct. 655. The Court also concluded that because "currency structuring is not inevitably nefarious" and there are "many occasions" on which individuals may structure transactions without seeking to avoid any law, Congress had included the willfulness requirement to limit criminal prosecutions to those individuals who know that their structuring of transactions is illegal. *Id.* at 144–46, 114 S.Ct. 655. For these reasons, the majority held that the word "willfully," as used in the anti-structuring statute, required a finding by the jury that the accused "knew the structuring in which he engaged was unlawful." [10] *Id.* at 149, 114 S.Ct. 655.

In these cases, the Supreme Court reiterated the "venerable" and "deeply rooted" common-law principle that ignorance or a mistake of law is no defense to criminal prosecution. *Ratzlaf,* 510 U.S. at 149, 114 S.Ct. 655; *Cheek,* 498 U.S. at 199, 111 S.Ct. 604; *see also Pappas v. State,* 135 Tenn. 499, 188 S.W. 52, 53 (1916) ("[I]t has been many times decided, and indeed is the admitted general rule, that ignorance of the law is no defense against a criminal charge." (internal quotation omitted)). In *Cheek,* the Court specifically observed that Congress had "carv[ed] out a general exception to the traditional rule" in criminal tax cases and that "[t]his special treatment of criminal tax offenses is largely due to the complexity of the tax laws." 498 U.S. at 200, 111 S.Ct. 604. We do not believe, therefore, that the interpretation of "willfully" in *Cheek* applies beyond the boundaries of the federal tax laws. *See, e.g., United States v. Hildebrandt,* 961 F.2d 116, 118–19 (8th Cir.1992) (affirming the district court's refusal to give an instruction based upon *Cheek* because "[t]he *Cheek* holding was premised on the complexity of the tax laws . . . [and i]f *Cheek* is to be expanded, that expansion must be made by the Supreme Court.").

---

**10.** Less than a year after the *Ratzlaf* decision, Congress responded to it by deleting the statutory willfulness requirement from the criminal penalties provision of the anti-structuring statute. *See United States v. Griffin,* 84 F.3d 912, 923 n. 7 (7th Cir.1996). The law now simply states that an individual may be fined or imprisoned for any violation of the statute. 31 U.S.C. § 5324(d) (2009).

Similarly, in *Ratzlaf*, the Court stated that its holding did "not dishonor the venerable principle that ignorance of the law generally is no defense to a criminal charge," because "[i]n particular contexts," such as the anti-structuring provisions, "Congress may decree otherwise." 510 U.S. at 149, 114 S.Ct. 655. The Court also interpreted the criminal anti-structuring statutes "mindful of the complex of provisions in which they are embedded." *Id.* at 141, 114 S.Ct. 655. Both the federal laws prohibiting the structuring of transactions, as interpreted in *Ratzlaf*, and the Tennessee Securities Act of 1980, at issue in this case, establish two classes of offenders: those non-criminal offenders who merely violate the statute and those criminal offenders who do so willfully. The difference in the two regulatory schemes, however, is found in language of the statutes underlying the provisions addressing criminal penalties. In *Ratzlaf*, 31 U.S.C. § 5324(3) already prohibited structuring transactions "for the purpose of evading the reporting requirements," so the willfulness requirement of § 5322(a) required the further element of knowledge that the act was illegal in order to constitute a criminal violation. Tennessee Code Annotated section 48–2–109(a) does not include such a purpose requirement. In consequence, the willfulness requirement of section 48–2–123(a) can be established by evidence that an individual knows that the investment products she is selling are securities and that she knows she is not registered as a broker-dealer or agent. Because the case before us does not share the "particular context" present in *Ratzlaf*, the definition of "willfully" that the high court reached there is of little persuasive effect in this instance.

### B. Construing "Willfully" in the Securities Context

 We believe that the inclusion of the word "willfully" in Tennessee Code Annotated section 48–2–123(a) does not mean that specific knowledge of an illegal act is necessary to support a conviction for a criminal violation of the Tennessee Securities Act. Instead, proof that the accused acted deliberately and was fully aware of his or her conduct is sufficient to warrant a criminal conviction under Tennessee Code Annotated section 48–2–123(a). This interpretation of the provision is not only consistent with the terms of the 1956 Uniform Securities Act and the vast majority of other jurisdictions that have construed statutes based upon the Act, but also compliant with the remedial purposes of our securities laws.

The 1956 Uniform Securities Act, which the legislature substantially adopted when it enacted the 1980 Securities Act, used the term "willfully" to require only that the individual act deliberately, not necessarily that he know the illegality of his actions. As stated, Tennessee Code Annotated section 48–2–123(a) is virtually identical to section 409 of the 1956 Uniform Securities Act. The official comment to section 409 of the 1956 Uniform Securities Act directs the reader to the comment under section 204(a)(2)(B) for the meaning of "willfully." Unif. Sec. Act § 409 cmt. (1956 amended 1958), 7C U.L.A. app. I at 873. The comment to section 204(a)(2)(B) states as follows:

> As the federal courts and the SEC have construed the term "willfully" in § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b), *all that is required is proof that the person acted intentionally in the sense that he was aware of what he was doing.* Proof of evil motive or intent to violate the law, or knowledge that the law was being violated, is not required. The principal function of the word "willfully" is thus to serve as a

legislative hint of self-restraint to the Administrator.

§ 204(a)(2)(B) cmt., *id.* at 788 (emphasis added).[11] "When the legislature enacts provisions of a uniform or model act without significant alteration, it may be generally presumed to have adopted the expressed intention of the drafters of that uniform or model act." *Heirs of Ellis v. Estate of Ellis,* 71 S.W.3d 705, 713 (Tenn. 2002); *see also Kradel v. Piper Indus., Inc.,* 60 S.W.3d 744, 754 & n. 6 (Tenn. 2001). The inclusion of the word "willfully" in section 48–2–123, therefore, suggests an interpretation consistent with the 1956 Uniform Securities Act.[12]

We also look to interpretations of provisions in other jurisdictions that, like the Tennessee Securities Act of 1980, are derived from the 1956 Uniform Securities Act. *Kradel,* 60 S.W.3d at 751 n. 2. The clear majority of state courts, when considering criminal prosecutions for either the sale of unregistered securities or the sale of securities by an unregistered individual, have held that the state need not prove that the accused knew his acts were illegal in order to behave willfully.[13] *See, e.g., Bayhi v. State,* 629 So.2d 782, 792 (Ala.Crim.App.1993) (holding that evidence was sufficient to support convictions for willfully engaging in fraudulent conduct in connection with sale of securities because "[k]nowledge that the act violates the securities laws ... is not relevant"); *State v. Andresen,* 256 Conn. 313, 773 A.2d 328, 346 (2001) ("We hold, as have the overwhelming majority of jurisdictions, that the offense of wilfully selling unregistered securities requires proof only that the defendant intended to do the act prohibited by the statute."); *Greenhill v. State,* 199 Ga.App. 218, 404 S.E.2d 577, 581 (1991) ("The trial court's instruction that willful means knowingly and intentionally [selling unregistered securities when the defendant himself was unregistered] was not in error."); *State v. Kershner,* 15 Kan.App.2d 17, 801 P.2d 68, 70 (1990) (holding that "willfully" violating

11. The comment to the criminal penalties section of the 2002 Uniform Securities Act contains similar language. Unif. Sec. Act. § 508 cmt. 2 (2002), 7C U.L.A. at 158.

12. The Defendant objects to our giving any deference to the expressed intent of the drafters of the Uniform Act. He argues that

careful reading of the body of law offered by the State and *amicus curiae* reveals that the learned professors offered a uniform law, a number of state courts then deferred to it citing the learned professors (and little else), and a new generation of learned professors have now cited back to the deferential state courts as proof that their mentors were right in the first place.

We need not respond in detail to the Defendant's pejorative characterization of the symbiosis between academia, legislature, and the judiciary as a "circular and convenient padding of authority." We do, however, observe that our General Assembly has a long history of considering the work and recommendations of experts in the field when drafting

legislation. *See, e.g., Highwoods Props., Inc. v. City of Memphis,* 297 S.W.3d 695, 704–05 (Tenn.2009) (noting that the legislature, in adopting the 1955 law governing the annexation of land to the borders of existing municipalities, "considered and, in part, modified and adopted" the recommendations in a 1954 Vanderbilt Law Review article by Professor Wallace Mendelson).

13. The majority of federal courts interpreting provisions of the federal securities laws, upon which the 1956 Uniform Securities Act was based, have reached a similar conclusion regarding the meaning of the word "willfully." *See, e.g., United States v. Tarallo,* 380 F.3d 1174, 1188 (9th Cir.2004) (" '[W]illfully' as it is used in [15 U.S.C.] § 78ff(a) means intentionally undertaking an act that one knows to be wrongful; 'willfully' in this context does *not* require that the actor know specifically that the conduct was unlawful."); *United States v. Peltz,* 433 F.2d 48, 54 (2d Cir.1970) ("A person can willfully violate an SEC rule even if he does not know of its existence.").

the prohibition on engaging in business as a broker-dealer or agent without registering with the state "means the defendant acted intentionally in the sense that he was aware of what he was doing"); *Commonwealth v. Allen*, 441 S.W.2d 424, 427 (Ky.Ct.App.1969) (holding it "immaterial" that one charged with willfully selling unregistered securities had no actual knowledge that he was violating the law, because "he was presumed to have and is chargeable with knowledge of the laws under which he was undertaking to do business"); *State v. Dumke*, 901 S.W.2d 100, 103 (Mo.Ct.App.1995) ("To sustain a conviction [for willfully transacting business as an unregistered security agent] under the statute, it is not necessary to find that the accused realized his conduct was in violation of registration requirements."); *State v. Irons*, 254 Neb. 18, 574 N.W.2d 144, 150 (1998) ("There is no requirement that the defendant purposely intended to violate the law in order to be convicted [for willfully selling unregistered securities]."); *State v. Russell*, 119 N.J.Super. 344, 291 A.2d 583, 587–88 (N.J.Super.Ct.App.Div.1972) (holding that a conviction for willful sale of unregistered securities through unregistered and unlicensed agents does not require knowledge that the law is being violated).

Two jurisdictions subscribe to the minority view. In *People v. Salas*, 37 Cal.4th 967, 38 Cal.Rptr.3d 624, 127 P.3d 40, 48 (2006), the California Supreme Court relied heavily upon the established case law in its own state. In *Hentzner v. State*, 613 P.2d 821 (Alaska 1980), the Alaska Supreme Court explicitly considered and re-

jected the majority view as to the criminal penalties provision found within the 1956 Uniform Securities Act. The Alaska court held instead that a conviction for a willful violation of a securities registration provision requires evidence that the accused was aware his act was wrongful. *Id.* at 826–27. Some courts and commentators view the Alaska decision as an "aberration." [14] *E.g., Dumke*, 901 S.W.2d at 104; Joseph C. Long, 12A *Blue Sky Law* § 10:17 (Westlaw 2009) ("The *Hentzner* ... decision[ ] seem[s] clearly incorrect and to fly in the face of the acknowledged purpose for enacting the Securities Acts .... [which is] to protect the general public from ingenious investment schemes." (footnote omitted)).

The second sentence in section 48–2–123(a), which prohibits imprisonment for the violation of any rule or order for any person who proves that he or she had no actual knowledge of the rule or order, supports our adoption of the majority rule. "[W]here the legislature includes particular language in one section of the statute but omits it in another section of the same act, it is presumed that the legislature acted purposefully in including or excluding that particular subject." *State v. Hawk*, 170 S.W.3d 547, 551 (Tenn.2005) (quoting *Bryant v. Genco Stamping & Mfg. Co.*, 33 S.W.3d 761, 765 (Tenn.2000)). By stating that the level of punishment for violations of the rules and regulations promulgated under the 1980 Securities Act is subject to a heightened knowledge requirement, the legislature sent a clear signal that such a requirement does not exist

---

14. Notably, even *Hentzner* does not go so far as to hold that the state must prove that the defendant knew his act was illegal. 613 P.2d at 825 ("There are several possibilities. One is that the defendant must act intentionally in the sense that he is aware of what he is doing; another is that the defendant must be aware

that what he is doing is illegal; and a third is that the defendant must know that what he is doing is wrong. It is in this last sense that we think 'wilfully' should be interpreted as it is used in [the state securities act]." (footnote omitted)).

for violations of the Act itself.[15] *See, e.g., United States v. Schwartz*, 464 F.2d 499, 509 (2d Cir.1972) (holding that the last sentence of 15 U.S.C. § 78ff(a), which matches the second independent clause of section 409(a) of the 1956 Uniform Securities Act, "makes it clear that the statute contemplates a 'willful' violation by one who has no knowledge of the violated rule or regulation" (footnote omitted)).

■ Our adoption of the majority rule is also consistent with the remedial purposes of the state securities laws. We reiterate that our

> securities laws "are remedial in character, designed to prevent frauds and impositions upon the public, and consequently should be liberally construed to effectuate the purpose of the acts." Since the Tennessee Securities Act of 1980 was enacted with the goal of protecting investors, this Court's primary concern is with the investors of this state.

*King*, 91 S.W.3d at 323–24 (quoting *DeWees v. State*, 216 Tenn. 104, 390 S.W.2d 241, 242 (1965)). Defining "willfully" in Tennessee Code Annotated section 48–2–123(a) in such a way that the state would be required to prove that the accused knew his activities were illegal would make that provision very difficult to enforce, and, in our view, put Tennessee investors unnecessarily at risk. *See, e.g., Andresen*, 773 A.2d at 346 (positing that requiring specific intent "as a predicate to enforcing [the] prohibition on the sale of unregistered securities effectively would diminish

the statute's remedial purpose"); *Dumke*, 901 S.W.2d at 102–03 ("A definition of 'willful' requiring proof of an evil motive, or of awareness that he was violating the law, would make enforcement difficult and would hinder" the "primary purpose of the securities laws[, which] is to protect those who purchase securities."). Our holding is also in harmony with *State v. Brewer*, 932 S.W.2d 1 (Tenn.Crim.App.1996), in which the Court of Criminal Appeals held that advice of counsel is no defense to a violation of the securities laws. *Id.* at 17 (quoting *Hunter v. State*, 158 Tenn. 63, 12 S.W.2d 361, 362 (1928) ("The fact that a person honestly believes that he has a right to do what the law declares to be illegal will not affect the criminality of the act.")).

There is ample evidence in the record that the Defendant was not only aware that he was selling securities, in the form of preferred shares of PhyMed stock, but also knew that he was not registered as a broker-dealer or agent under Tennessee Code Annotated section 48–2–109(a). The Defendant entered into an agreed order admitting as much at the conclusion of the Department's investigation into Olde South's sale of PhyMed preferred securities. The Defendant's claim that he believed he did not need to register as a broker-dealer or broker-dealer agent under section 48–2–109(a) because he understood the PhyMed securities to be exempt from registration under section 48–2–104(a) is no defense.[16]

---

**15.** The draftsmen's commentary to section 409 of the 1956 Uniform Securities Act makes clear that this second sentence was included because of the complex nature of administrative regulations. Louis Loss, *Commentary on the Uniform Securities Act* 145 (1976) ("Since not all states have an Administrative Procedure Act, and administrative rules and orders

are not always easy to find, such a provision seems even more essential at the state level.").

**16.** Because of our interpretation of the term "willfully," we need not consider the State's circumstantial evidence suggesting that the Department's previous investigations of the Defendant put him on notice that he was violating the law by selling PhyMed preferred

### Conclusion

Based upon our interpretation of the term "willfully" in section 48–2–123(a), the trial court's instruction was proper, and the evidence was sufficient to convict the Defendant on each of the fifteen counts of willfully violating the Tennessee securities laws. The judgment of the Court of Criminal Appeals is reversed. The convictions and sentences are reinstated. Costs of this appeal are assessed to the Defendant, for which execution may issue if necessary.

shares without registering as a broker-dealer or broker-dealer agent.