# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 6, 2011 Session

## ANTHONY D. BYERS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-07888      James M. Lammey, Jr., Judge**

---

**No. W2011-00473-CCA-R3-PC  - Filed March 15, 2012**

---

The petitioner, Anthony D. Byers, appeals the post-conviction court's denial of his petition for post-conviction relief from his guilty plea convictions for seven counts of especially aggravated kidnapping, four counts of aggravated robbery, and one count of possessing a firearm during the commission of a dangerous felony.  The petitioner raises stand-alone claims that:  (1) his convictions for especially aggravated kidnapping and possession of a firearm during the commission of a dangerous felony are void because they are in direct contravention of Tennessee Code Annotated section 39-17-1324(c); (2) his convictions for especially aggravated kidnapping, aggravated robbery, and possession of a firearm during the commission of a dangerous felony are voidable on double jeopardy grounds; and (3) three of his convictions for especially aggravated kidnapping are contrary to State v. Dixon, 957 S.W.2d 532 (Tenn. 1998).  The petitioner also argues that he received the ineffective assistance of counsel and that his guilty pleas were involuntarily.  After review, we affirm the denial of post-conviction relief from the petitioner's convictions for seven counts of especially aggravated kidnapping and four counts of aggravated robbery.  However, we reverse the denial of post-conviction relief from the petitioner's conviction for possession of a firearm during the commission of a dangerous felony and vacate and dismiss that conviction and sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part and Reversed in Part**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

R. Todd Mosley, Memphis, Tennessee, for the appellant, Anthony D. Byers.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Summer Morgan, Assistant District Attorney

General, for the appellee, State of Tennessee.

**OPINION**

<u>FACTS</u>

In December 2008, the petitioner was indicted on seven counts of especially aggravated kidnapping, four counts of aggravated robbery, one count of aggravated burglary, one count of attempted aggravated robbery, and one count of employing a firearm during the commission of a dangerous felony. Counsel was appointed and, on October 5, 2009, the petitioner entered a best interest plea, with the imposition of the minimum sentences, to seven counts of especially aggravated kidnapping, with concurrent 13.5-year sentences as a violent offender; four counts of aggravated robbery, with concurrent 7.2-year sentences as a mitigated offender to run concurrently with the 13.5-year sentences; and one count of possessing a firearm during the commission of a dangerous felony, with a 3-year sentence to run consecutively to the other sentences, for an effective sentence of 16.5 years.

At the plea hearing, the trial court reviewed the charges against the petitioner and his potential sentencing exposure, as well as answered any of the petitioner's questions. There was some mention regarding the petitioner being a Range III offender, but the court clarified that the petitioner was actually a Range II offender.

Counsel explained to the petitioner that several of the State's witnesses were missing, one of whom counsel thought was very important to the defense's case and whose absence might require that the petitioner testify. Counsel reminded the petitioner that the State's original offer was for 25 years and that its present offer of 16.5 years was "as good as it's ever going to get." Counsel made it clear to the petitioner that the trial court's rule was that a case set for trial would go to trial, so the trial would proceed if the petitioner rejected the offer. The petitioner indicated that he wanted some time to think about the offer, and the trial court said that it would not reset the trial. The petitioner informed the court that he felt like he was being "forced into this situation" because he had complained about counsel, whom he alleged had not done "a lot of things" he had asked. The petitioner then informed the court that he was rejecting the offer, but counsel asked that the court wait on accepting the rejection until the petitioner could discuss his complaints with the court.

In discussing his complaints, the petitioner stated that he wanted counsel to file a motion to have his charges reduced to lesser-included offenses. The court explained that factual determinations were made by the jury at trial, and the petitioner acknowledged that he understood. The petitioner also complained about the absence of a State witness, Marcus Wallace, whom the petitioner said "play[ed] a key role in this whole . . . thing," and asked

that the trial be postponed until Wallace could be found. The court explained that the petitioner was not going to be held in jail indefinitely, while they waited for Wallace to be found with no leads on his whereabouts.

The court asked if the petitioner had any other questions, and he said that he did not. However, the petitioner then complained about a missing witness of his own, his aunt, Helen Williams. Counsel explained that he was not given any contact information on Williams and that it was his understanding that Williams could only testify to events that took place before the actual events in the case.

The court reviewed the State's current offer with the petitioner, noting that he had already served a year in jail. Given the amount of time served and the possibility of 15% good behavior credits, the petitioner faced about thirteen years in jail. The court reiterated that if the petitioner went to trial and was convicted, he faced a sentence of twenty-five to forty years on each one of the Class A felonies. The court noted that the petitioner also faced the possibility of consecutive sentencing as a dangerous offender and as an offender with an extensive record of criminal activity and explained those concepts to him.

The court recessed while the petitioner conferred with counsel. After the recess, counsel informed the court that the State rejected a request by the petitioner to reduce the sentence by six months because the instant sentences, based on mitigated offender status, were the lowest the statutes provided. The petitioner told the court that he wanted to go to trial. The court asked the petitioner if he was rejecting the offer because of the State's refusal to lower it by six months, and the petitioner said, "I'm so confused now I don't know what to do." The court responded that it would not allow the petitioner to plead guilty if he was confused. The petitioner then asked for clarification on the specifics of the amount of time he would have to serve, after which he said, "I'll take it."

The court said that it was not going to allow the petitioner to take the plea if he was only wanting to plead guilty because he had a complaint against counsel. The court then asked the petitioner whether he was taking the plea because of his complaint against counsel, and the petitioner did not respond. The court opined that the petitioner might be "playing games," but the petitioner denied such. The court said that it was probably best for the case to go to trial, but the petitioner said that he wanted to plead. The court told the petitioner to confer with counsel again.

After the petitioner consulted with counsel, the proceedings continued with the State going over the specifics of the petitioner's plea. The State then relayed the factual basis for the plea as follows:

[T]he facts in these matters . . . occurred back on June 21st of 08. Police were actually called to . . . 3725 Millbranch, an apartment complex. The complainant was a Marcus Wallace, he had just left his apartment at that location. He was there with a Hugo Gomez, an acquaintance of his, when the [petitioner] Mr. Anthony Byers and a second man, Jamey Jones, the co-defendant, entered that apartment. They had a dog on a leash as well as handguns.

[The petitioner] and his co-defendant Jamey Jones identified themselves as police. They actually made Mr. Gomez get on the floor as well as Marcus Wallace and another occupant Antonio Jones (sic). And during the course of events they did take from Mr. Marcus Wallace several hundred dollars in cash. They did search Hugo Gomez's wallet and take it from his possession in an effort to take his cash. Mr. Antonio Young was asked to remove his wallet, they checked for contents, he had no cash and left the wallet on the table.

Meanwhile Jose Rubio, Claudia Otero, as well as two children, Natalie Rubio . . . and Markuila Sanders were outside awaiting Hugo Gomez who they had given a ride to that location. [The petitioner] came outside with the dog and the gun and forced the four other occupants into the apartment at which time he did take Jose Rubio's wallet and cash. And he proceeded outside to the truck and went through Ms. Otero's purse. She did lose I believe credit cards and possibly a small amount of cash through the course of these events.

And police did arrive before [the petitioner] left the scene. They detained [the petitioner], found a handgun in his . . . back pocket or the back of his pants matching the description given by the witnesses. The witnesses did identify him as being the gunman in this scenario. The co-defendant fled the scene but was later apprehended.

The petitioner's counsel stipulated that those would have been the facts presented by the State had they gone to trial and asked that the court accept the plea pursuant to Alford v. North Carolina. Counsel then explained that

[h]ad [they] gone to trial the defense would ha[ve] been that Mr. Marcus Wallace had sold [the petitioner] three hundred dollars of powder cocaine. When [the petitioner] took this home to make crack for his own personal use it turned out that there was only about twenty dollars worth of

-4-

crack in it, the rest was filler. He went back over there to get back either his money or drugs.

When he got there Mr. Wallace said that he had the money but [the petitioner] wanted drugs. Mr. Wallace stated that there would be Mexicans showing up to bring him drugs. He allowed one of Mr. Wallace's partners to go and call the Mexicans, I believe that was Antonio Jones, . . . but this person left and made the call to the police instead and that would ha[ve] been the defense's statement to the jury or our evidence to the jury had this matter gone to trial.

The court then began a lengthy plea colloquy with the petitioner. The court first ascertained that the petitioner had received two years of college education. The court explained that the petitioner's plea was an Alford plea, or a best interest plea, and what that meant. The court explained that the petitioner had the right to a trial and all that entailed. The court also explained the difference between especially aggravated kidnapping by use of a deadly weapon and aggravated kidnapping and that the jury would be charged on all other lesser-included offenses.

The court again explained the possible sentences the petitioner faced if convicted after a trial and that the sentences in the offer were the absolute lowest sentences that could be imposed for each conviction. The court also explained that the petitioner was not eligible for parole on the especially aggravated kidnapping convictions but could receive 15% sentence credits for good behavior. The court noted that two of the charges against the petitioner were being dismissed and that the firearm charge was being reduced from "employing" to "just possession[.]" The court stated that the plea agreement included a provision of no anticipated federal prosecution on the gun charge; however, if the federal prosecutor decided otherwise, the court would immediately set aside the plea. The court reiterated that the petitioner's convictions, although Alford pleas, could still be used against him in any future prosecutions.

The court then ascertained that the petitioner understood all of the ramifications of his plea agreement and that he wanted to enter the pleas. The petitioner stated that he understood everything the court had explained and that he still wished to plead guilty. The court reviewed the petitioner's prior concerns about feeling forced to enter a plea due to his dissatisfaction with counsel, and the petitioner responded that was not the reason he wanted to plead guilty. The court stated on the record that it had spent the entire afternoon making sure the petitioner was aware of all the ramifications of the plea agreement and that it appeared the petitioner was truthful in stating that he was entering a plea because he felt it was in his best interest whether or not he committed the crime. Accordingly, the court

-5-

accepted the petitioner's guilty pleas as being freely and voluntarily entered.

The petitioner filed a *pro se* petition for post-conviction relief and, after the appointment of counsel, several amended petitions were filed. The post-conviction court conducted an evidentiary hearing, at which the petitioner testified that counsel did not investigate certain issues, and they did not have enough time to discuss trial strategy. However, he acknowledged that he told counsel his version of what had happened and gave counsel the name of his aunt, Helen Williams, as a possible witness. The petitioner said that counsel visited him only twice, once to bring him the discovery packet, but only after he wrote the Board of Professional Responsibility, and the other the day before trial for about ten minutes. The petitioner explained that he wanted to see the discovery packet so he could make an informed decision whether to plead guilty or go to trial. He was not aware of counsel using an investigator on the case.

The petitioner testified that counsel told him incorrectly that he was a Range III offender and would "die in prison" if sentenced as such after a trial. Counsel advised him that the plea agreement was a "good deal" because he would "never get out of prison" if convicted. The petitioner said that he pled guilty under duress because he did not want to die in prison.

The petitioner testified that he requested that counsel file a "motion for lesser included offenses," but counsel did not do so. The petitioner's case was transferred to another division, and the petitioner asked the new judge to let him have time to hire a private attorney. However, the judge told him that he either had to plead guilty or go to trial that day. The petitioner did not feel prepared to go to trial because he felt that counsel was mad at him for having written a letter to the original trial judge complaining about him. He felt pressured by both the court and counsel into taking the plea. Counsel kept telling him that he would die in prison, and the petitioner was "scared." The petitioner testified that the entire plea hearing lasted about thirty minutes. He believed that his charges would have been reduced to lesser charges if he had gone to trial, but he did not feel comfortable going to trial with counsel as his attorney.

On cross-examination, the petitioner admitted that he told counsel that his aunt, Helen Williams, was a crack addict who had purchased crack from one of the victims, but he maintained that he thought the jury would nonetheless believe her. The petitioner acknowledged that he talked to counsel on the day of his arraignment and gave him information about his case, which counsel wrote down. The petitioner also acknowledged that counsel had no control over the State's decision to offer a plea. The petitioner recalled that the trial court explained the elements of especially aggravated kidnapping and aggravated kidnapping to him but that he did not understand everything he was told.

On redirect examination, the petitioner insisted that his meetings with counsel were short. He admitted that he told the trial court at the plea hearing that he understood what he was doing, but explained that he did not answer the court's questions correctly because of the pressure he was feeling that day.

On examination by the court, the petitioner said that he was not a Range III offender, despite having five prior Class C felony convictions, as well as a Class D and Class E felony conviction. The petitioner admitted that he also had several misdemeanor convictions, a criminal record dating back to 1991, and that he had entered many guilty pleas in his life. The prosecutor then clarified that the petitioner had been determined to be a Range II offender and that the trial court had made the petitioner aware of that at the plea hearing. The petitioner asserted that his aunt, Helen Williams, would have testified that it was "a drug deal [gone] bad," not a robbery or kidnapping. Williams would have said that Marcus Wallace sold the petitioner fake cocaine and that the petitioner went to Wallace's house to get his money back.

The petitioner's trial counsel testified that he was appointed to represent the petitioner at the petitioner's arraignment and was given discovery by the State at that time. The State's original offer was for an effective twenty-five-year sentence. Counsel recalled that he gave the petitioner a copy of the discovery that day and conducted an intake interview. The intake interview related, in great detail, the petitioner's version of events.

Counsel recalled that he learned in the discovery that the petitioner's co-defendant, Jamey Jones, gave a statement to police in which he admitted it was a robbery, and Jones's statement matched that of the victims. However, the petitioner told counsel that the incident was the result of a bad drug deal with one of the victims. Counsel advised him that the only way he could relay his version of events to the jury was if he testified but that the jury would not like hearing that he had kicked down a door and had a gun. He also advised the petitioner that the jury might not find Williams to be a credible witness in that she was a drug addict.

Counsel testified that even though he thought it was favorable that the petitioner let one victim leave, counsel told the petitioner that his "story's not real good, and everybody else's story is pretty heinous because there's small children involved. And the likelihood of conviction on this is great." Counsel based his assessment of the petitioner's case on his experience, including ten years of experience on the Major Violators Unit of the public defender's office. With regard to Major Violators cases, counsel explained that those are the "wors[t] of the wors[t] in the State's mind" and that those offers were always higher. He said that the State also had a policy of not reducing charges on certain Class A felonies.

Counsel testified that, on the day of trial, the State made an offer of thirteen and a half years. Counsel felt that the State's offer was good, as he had originally calculated the petitioner to be a Ranger III offender, facing a minimum of fifty years and a maximum of five hundred and eighty years. However, on the day of trial, it was clarified that the petitioner was actually a Range II offender due to the dates of some of his prior offenses but that he would still face a minimum of twenty-five years and a maximum of two hundred and eighty years as such. Additionally, the plea included a provision for no federal prosecution on the gun charge, which would have carried a consecutive fifteen to twenty-five-year sentence as well.

With regard to the petitioner's having filed a complaint against him with the Board of Professional Responsibility, counsel testified that it was not unusual for him, as an attorney in the public defender's office, to have to respond to complaints from clients and it "never affects [his] ability to do [his] job zealously for [his] clients." Counsel said that the petitioner was unhappy that he would not file certain motions that counsel believed were improper or not supported by the record. Counsel did not believe that the charge of possession of a firearm during the commission of a dangerous felony violated double jeopardy, but he admitted that it was a relatively new statute at the time of the plea and that he did not regularly practice appellate work. He did not ask the opinion of other attorneys regarding the statute because "it seemed cut and dry, pretty straightforward[.]"

Counsel acknowledged that on page fifty-six of the plea hearing transcript, the petitioner admitted that he thought he would get convicted at trial and probably be sentenced to more time than that offered in the plea. Counsel said that he was prepared to go to trial that day and to cross-examine the witnesses.

In denying post-conviction relief, the court found that counsel rendered effective assistance, the petitioner's guilty pleas were knowingly and voluntarily entered, and the conviction on the gun charge was not void.

**ANALYSIS**

On appeal, the petitioner raises stand-alone claims that: (1) his convictions for especially aggravated kidnapping and possession of a firearm during the commission of a dangerous felony are void because they are in direct contravention of Tennessee Code Annotated section 39-17-1324(c); (2) his convictions for especially aggravated kidnapping, aggravated robbery, and possession of a firearm during the commission of a dangerous felony are voidable on double jeopardy grounds; and (3) three of his convictions for especially aggravated kidnapping are contrary to State v. Dixon. The petitioner also argues

-8-

that he received the ineffective assistance of counsel and that his guilty pleas were involuntary.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

## I. Stand-Alone Claims

With regard to the petitioner's stand-alone claims, the State responds that the petitioner waived the claims because he waived his right to appeal when he pled guilty. However, the State acknowledged, citing State v. Dennis Neil Bizzoco, No. E2009-00768-CCA-R3-CD, 2011 WL 743404, at *6 (Tenn. Crim. App. Mar. 3, 2011), perm. to appeal denied (Tenn. July 14, 2011), that this court has rejected such a waiver argument with regard to double jeopardy claims and also determined that it would address the petitioner's stand-alone claims as the petitioner raised the same claims in the context of ineffective assistance of counsel. We will address the petitioner's claims.

## A. Tennessee Code Annotated section 39-17-1324(c)

The petitioner argues that his convictions for especially aggravated kidnapping and possession of a firearm during the commission of a dangerous felony are void as being in direct contravention of Tennessee Code Annotated section 39-17-1324(c).

The statute in question provides, in pertinent part, as follows:

> (a) It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony.
>
> . . . .
>
> (c) A person may not be charged with a violation of subsection (a) or

(b) if possessing or employing a firearm is an essential element of the underlying dangerous felony as charged. In cases where possession or employing a firearm are elements of the charged offense, the state may elect to prosecute under a lesser offense wherein possession or employing a firearm is not an element of the offense.

. . . .

(i) As used in this section, unless the context otherwise requires:

(1) "Dangerous felony" means:

. . . .

(E) Especially aggravated kidnapping, as defined in § 39-13-305[.]

Tenn. Code Ann. § 39-17-1324(a), (c), (i)(1)(E).

Especially aggravated kidnapping occurs when one:

knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty, when: (1) [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; (2) [w]here the victim was under the age of thirteen (13) at the time of the removal or confinement; (3) [c]ommitted to hold the victim for ransom or reward, or as a shield or hostage; or (4) [w]here the victim suffers serious bodily injury.

Id. § 39-13-305(a).

The petitioner argues that, because his especially aggravated kidnapping convictions "were based upon the use of a weapon, namely, a firearm," section 1324(c) "directs that in order for the State to charge [him] with the firearm offense, the State may only do so by reducing the underlying offense to one that does not require possessing or employing a firearm." The State responds that the petitioner was indicted on the especially aggravated kidnapping charges for use of a deadly weapon, not specifically a firearm, and that the statute precludes prosecution only if possession of a *firearm* is an essential element of the underlying dangerous felony as charged.

The issue raised is one of statutory construction. When interpreting a statute,

we "must first ascertain and then give full effect to the General Assembly's intent and purpose" in drafting those sections. Waldschmidt v. Reassure Am. Life Ins. Co., 271 S.W.3d 173, 176 (Tenn. 2008). Our chief concern is to carry out the legislature's intent without unduly broadening or restricting the statute. Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)). We presume that every word in a statute has meaning and purpose and should be given full effect if so doing does not violate the legislature's obvious intent. In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005). When the statutory language is clear and unambiguous, we simply apply its plain meaning. Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). When a statute is ambiguous, however, we may refer to the broader statutory scheme, the history of the legislation, or other sources to discern its meaning. Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008). We presume that the General Assembly was aware of its prior enactments and knew the state of the law at the time it passed the legislation. Owens, 908 S.W.2d at 926.

State v. Casper, 297 S.W.3d 676, 683 (Tenn. 2009).

Upon review, we are constrained to agree with the petitioner's statutory interpretation, and correspondingly we simply cannot agree with the State's assertion. If the State could avert the constraints of the statute by always using the term "deadly weapon" instead of "firearm" when the deadly weapon at issue was clearly and solely a firearm, then section 1324(c) would essentially become meaningless because the State would never use the term "firearm" in an indictment. We cannot believe that it was our legislature's intent to draft a statute that could so easily be circumvented with a simple change of phraseology in the indictment. We interpret the language "essential element of the underlying dangerous felony *as charged*" to refer to the fact that some of the enumerated dangerous felonies can be committed in a variety of ways, some having nothing to do with the use of a weapon of any kind,[1] see Tenn. Code Ann. § 39-17-1324(c) (emphasis added), and not to an invitation for "fast and loose" play on words. Accordingly, we conclude that the petitioner's conviction for possession of a firearm during the commission of a dangerous felony is void.

The petitioner asserts that the appropriate remedy is that his especially aggravated

---

[1] For instance, as noted above, an especially aggravated kidnapping can be considered as such where the false imprisonment was of a victim under the age of thirteen; it was committed to hold the victim for ransom or reward, or as a shield or hostage; or if the victim suffered serious bodily injury.

kidnapping convictions should be reduced to misdemeanor false imprisonment convictions, as that is the only offense that would satisfy the requirement in section 1324(c) in light of the facts introduced at his plea hearing. However, this remedy is simply not available. Because the record reveals, as we will address below, that the petitioner's remaining guilty pleas were knowingly and voluntarily entered, the petitioner's convictions and sentences on seven counts of especially aggravated kidnapping and four counts of aggravated robbery remain intact, but we vacate and dismiss the possession of a firearm during the commission of a dangerous felony conviction and sentence.

## B. Double Jeopardy

The petitioner argues that his convictions for especially aggravated kidnapping and aggravated robbery violate principles of double jeopardy when his conviction for possession of a firearm during the commission of a dangerous felony is included in the calculus because "the evidence offered to prove the robbery and kidnapping charges . . . included the evidence necessary to prove the weapon charge." However, in light of our determination above that the petitioner's conviction for possession of a firearm during the commission of a dangerous felony is void, his allegation that the same conviction violates the principles of double jeopardy is pretermitted. It is not necessary for a court to address a constitutional issue if the resolution of the issue is not "absolutely necessary to determining the issues in the case and adjudicating the rights of the parties." State v. Taylor, 70 S.W.3d 717, 720 (Tenn. 2002) (citing Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)).

## C. State v. Dixon

The petitioner argues that three of his convictions for especially aggravated kidnapping violate due process as set forth in Dixon because they were incidental to the commission of his aggravated robberies. He acknowledges that he raised this issue for the first time on appeal but urges this court to review it for plain error.

When an issue is not addressed with the post-conviction court, it will generally not be addressed on appeal. Walsh v. State, 166 S.W.3d 641, 645-46 (Tenn. 2005); see Tenn. Code Ann. §§ 40-30-106(g), -110(f). Moreover, "the plain error rule, which would otherwise permit an appellate court to address the issue sua sponte, may not be applied in post-conviction proceedings to grounds that would otherwise be deemed either waived or previously determined." Grindstaff v. State, 297 S.W.3d 208, 219 (Tenn. 2009) (citing State v. West, 19 S.W.3d 753, 756-57 (Tenn. 2000)) (footnote omitted); Daniel Ewing v. State, No. M2010-02282-CCA-R3-PC, 2011 WL 4449673, at *7 (Tenn. Crim. App. Sept. 27, 2011); Charles Lee Rochell v. State, No. M2010-00150-CCA-R3-PC, 2010 WL 3774561, at *9 (Tenn. Crim. App. Sept. 29, 2010), perm. to appeal denied (Tenn. Feb. 16, 2011). The

petitioner asserts that plain error review is no longer precluded in post-conviction actions since the plain error rule became a rule of appellate procedure and not a rule of criminal procedure and that "the Grindstaff appeal would have originated well before the July 1, 2009 revision [and] therefore the Grindstaff opinion did not rule out plain error relief when based upon Tenn. R. App. P. 36(b)." However, our supreme court in Grindstaff cited to Tennessee Rule of Appellate Procedure 36(b), the "new" plain error rule, indicating that the rationale from West precluding plain error review in post-conviction actions remained applicable even after the statutory revisions. This issue is waived.

## II.  Ineffective Assistance of Counsel

The petitioner argues that he received ineffective assistance of counsel because counsel failed to dispute the applicability of the firearm charge in conjunction with the especially aggravated kidnapping charges and raise a double jeopardy violation on the same issue, failed to challenge the validity of the especially aggravated kidnapping charges as violating the principles set forth in Dixon, failed to visit him and keep him informed about his case, and coerced him into pleading guilty. He asserts that, but for counsel's deficiencies, he "would be facing a much shorter sentence, either reducing the time offered by the [S]tate or the total time that the trial court could have sentenced [him] had he taken the matter to trial and been convicted."

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

Upon review, we conclude that the petitioner has failed to show a reasonable probability that, but for counsel's alleged deficiencies, he would not have pled guilty and would have insisted on going to trial. The petitioner claims that he "would be facing a much shorter sentence," yet the sentence he received was the absolute minimum faced by a *mitigated* offender, which he was not, on one offense. Even hypothetically assuming counsel had successfully made the same statutory, double jeopardy, and Dixon challenges the petitioner made in this appeal, the petitioner would have still been facing four especially aggravated kidnapping convictions, each carrying a possible sentence of fifteen to sixty years, and four aggravated robbery convictions, each carrying a possible sentence of eight to thirty years, and he faced the likelihood of consecutive sentencing based on either his extensive criminal history or his being a dangerous offender. Given the lenient sentence the petitioner received and the potentially egregious sentence he faced, we cannot conclude that the petitioner has proven any alleged deficiencies by counsel caused him prejudice.

### III. Unknowing and Involuntary Plea

The petitioner lastly argues that his guilty pleas were not voluntary because he felt "coerced" into taking the plea bargain and "had little confidence that [counsel] would represent his interests at trial." When analyzing a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238 (1969), and the state standard set out in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given

before it can be accepted. 395 U.S. at 242. Similarly, our Tennessee Supreme Court in Mackey required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. Pettus, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he or she fully understands the plea and its consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S.W.2d at 904. Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05.

The petitioner argues that his guilty pleas were involuntary because he was coerced by counsel and the trial court into taking the plea agreement. In ruling on this issue, the post-conviction court noted that the plea colloquy was "unbelievably detailed." The court found that the petitioner "definitely knew what he was doing," observing that the petitioner had "so long of a record that he didn't even know how many times he's been arrested or convicted."

Our review of the record supports the ruling of the post-conviction court. The transcript from the plea hearing shows that the trial court was adamant that it was not going to allow the petitioner to take the plea if he was only wanting to plead guilty because he had a complaint against counsel and repeatedly addressed the petitioner's concerns and affirmed that the petitioner was pleading guilty because he felt that it was in his best interest. The court explained the possible sentences the petitioner faced if convicted after a trial and that the sentences in the offer were the absolute lowest sentences that could be imposed for each conviction. The court also explained all of the ramifications of the petitioner's taking the plea agreement. The petitioner suggests that part of the reason his plea was involuntary was because he was not properly informed about his sentencing range; however, he acknowledged at the post-conviction hearing that the trial court informed him that he was a Range II offender. The record shows that the petitioner, one with a long criminal record and experience with the justice system, was afforded the absolute minimum sentence and entered his pleas knowingly and voluntarily after a lengthy and thorough discourse with the

-15-

trial court.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the denial of post-conviction relief from the petitioner's convictions for seven counts of especially aggravated kidnapping and four counts of aggravated robbery. However, we reverse the denial of post-conviction relief from the petitioner's conviction for possession of a firearm during the commission of a dangerous felony and vacate and dismiss that conviction and sentence.

_____
ALAN E. GLENN, JUDGE