IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 4, 2013 Session

## CARRIE MOBLEY v. MARK ADAM MOBLEY

**Appeal from the Circuit Court for Monroe County**
**No. V10021S      J. Michael Sharp, Judge**

_____

**No. E2012-00390-COA-R3-CV-FILED-APRIL 30, 2013**

_____

This is divorce case pertaining to the marriage of Carrie Mobley ("Mother") and Mark Adam Mobley ("Father"). The parties were married for 15 years. They have three minor daughters (collectively "Children"). Following a two-day trial, the court divorced the parties, divided their marital property, and made decrees regarding the custody of the Children. With respect to the Children, the trial court designated Father as the primary residential parent; it then ordered a 50/50 shared residential parenting arrangement. Following the divorce, the court found Mother to be in willful contempt of multiple provisions of its judgment. It sentenced her to ten days in jail on each of five counts. The court suspended the sentences on condition that there be no further violations. Mother appeals. She challenges the trial court's judgment as to (1) the designation of Father as the primary residential parent, (2) portions of the residential parenting schedule, and (3) the inclusion of a "paramour provision" in the divorce judgment. In addition, she appeals the contempt findings, sentences, and award of fees to Father on the contempt proceedings. We reverse in part and affirm in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed in Part and Affirmed in Part; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

John W. Cleveland, Sr., Sweetwater, Tennessee, for the appellant, Carrie Mobley.

Randy Sellers, Cleveland, Tennessee, for the appellee, Mark Adam Mobley.

# OPINION

## I.

### A.

Father and Mother were married on June 2, 1995. At the time of trial, the Children were ages ten, eight, and five. The parties are college-educated school teachers. For the past 19 years, Mother has taught at Rural Vale Elementary School in Monroe County, where all three Children attend. Father is a special education teacher and a coach of boys' basketball at Central High School in McMinn County. Pending trial, the couple agreed to a temporary parenting plan under the terms of which Mother was the primary custodian and Father had typical visitation with the Children of every other weekend and one night a week. When the temporary plan was in effect, Mother and Children remained in the marital home in Tellico Plains, while Father moved to a three-bedroom, brick home with a "nice yard" in Etowah, some 25 minutes away.

From the start, the parties experienced problems in their relationship. After they were married, their disputes continued. A particularly intense argument took place in the presence of the Children in 2006. Mother repeatedly hit Father on the back of the head. Father raised his fist at her and attempted to slam a chair down on her, but never actually touched her. The parties threw each other's clothes into the yard. Janet Hooper, Mother's mother, went to the home. She found the police there, Father "irate," and Mother and the Children crying. When Mother and her mother asked the officers about getting a protective order, Father ran at Mother with his fist clenched and accused her and everyone else of telling lies about him. Both parties testified to other such incidents; the police were called more than once. Father said Mother frequently slapped him. He recalled five or six times that Mother had physically struck him when they argued. She once hit him with a metal sprayer on a hose pipe, cutting his head and rendering him unconscious.

Following the 2006 incident, the parties separated after Wife sought a protective order. They attended marital and family counseling and Husband saw a counselor of his own approximately 25 times. While Mother and Father were in marital counseling, she confronted him about the fact that he had discussed their marital relationship with his teaching assistant, with whom Mother suspected he was having an affair. According to Mother, Father "admitted that he had let it go too far and that it was inappropriate," but he failed to take steps to have her transferred to another classroom. Ultimately, the parties reconciled, but their contentious relationship did not improve. Mother alleged that Husband was sexually abusive in that he constantly prodded her into having sexual intercourse even while she was recovering from surgeries for "female problems." Father countered this by

-2-

testifying that the two resumed consensual relations only after Mother's doctor said it was safe to do so. Father denied ever sexually abusing Mother, striking her, or pushing her, but admitted he sometimes had anger issues. In a journal, he had written that he "sometimes [was] . . . rash and loud" when he became impatient. Father said he was generally not a confrontational type of person, but guessed that he and Mother knew how to upset each other. While trying to "make things right," Father saw a doctor and was prescribed medications for an obsessive/compulsive disorder, but he was not under a doctor's care at the time of trial. The parties separated again in 2009. Mother filed for divorce in January 2010.

Mother was the Children's primary caregiver. She felt that, once the Children came along, Father was jealous and resentful of the time she spent with them. She said Father was always upset about something and used a loud, "hateful" tone and angry hand gestures with the Children. He spanked them. Mother said Father's coaching obligations often conflicted with the temporary parenting schedule. Father testified that, although it brought in extra income the family needed, he had no problem giving up coaching entirely if he were awarded custody of the Children. He testified: "But if I do get the kids, there is just no way that I could care for them as well as I need to and be a coach and a single parent." Father coached after school most years from October through March.

Pending trial, Mother twice called the Department of Children's Services alleging sexual abuse by Father against one or more of the Children. Before Mother filed for divorce, both parties remained in the home but slept in separate bedrooms. During this time, Mother said Father refused to sleep anywhere but with the oldest child in her bed. Mother testified that her call to DCS was prompted by the oldest child telling her that Father had been "touching" her. Father admitted that the parties separated for several months before the divorce complaint was filed and that he remained in the marital home for financial reasons. He agreed that he slept in the oldest child's bedroom and that she sometimes slept with him, which, according to him, was not unusual. According to Father, the Children always ended up moving around at night, sleeping "wherever," – on the couch, with Father or with Mother, and had never consistently stayed in their own beds all night. Father adamantly denied any inappropriate interactions with any of the Children. He noted that the Children "didn't have any vanity" about using the restroom with the door wide open, undressing or bathing in front of him. Although he had always enjoyed roughhousing with the Children, Mother's allegations left him worried that even playing with them could bring about more accusations designed to hurt him.

Mother conceded that she had not mentioned sexual abuse of herself or the Children in her discovery responses. She also signed an agreed order for Father to have unsupervised, overnight visitation with the Children after reporting Father to DCS. DCS conducted an investigation that included interviews with the Children and concluded the allegations were

unfounded. It closed the case. At trial, Mother maintained her belief that Father had sexually abused the Children. Asked why she had not returned to DCS and insisted on further investigation, Mother said she had done all she could and that she currently had the Children in counseling. Mother asserted that she believed it was very important for the Children to grow up having a healthy relationship with Father and wanted Father to "be the best father he can be."

Much of the proof focused on Mother's admittedly-close relationship with K.K., the Children's 19-year-old babysitter and a member of Mother's Mary Kay team. Around 2008, Mother and K.K. began sharing frequent long walks and numerous lengthy phone conversations that often took place well into the night. Mother explained that she supported K.K. with advice on her personal life, school, and the cosmetic business. Eventually Mother began sharing her marital problems with K.K. In July 2009, the women went to Dallas for a Mary Kay meeting. During the trip, they shared a hotel room with another female, slept in the same bed, and went out drinking together. Mother agreed Father took issue with her behavior after seeing pictures of her and K.K. from the trip. At trial, both women denied that they were ever involved in a sexual relationship.

Father testified that up until 2008, when Mother started working on the side for Mary Kay cosmetics, she was an excellent mother and wife most of the time. Father admitted he was very envious of Mother's relationship with K.K., but also had concerns about K.K. from things Mother had told him. In explaining the reasons she spent so much time talking to K.K., Mother told Father that K.K. had lesbian relationships in high school, "popped" unprescribed pain pills, and had suicidal thoughts for which she had been in counseling. Father said he initially supported Mother's efforts at selling cosmetics, but later became suspicious. Father conceded he had no proof of a sexual relationship between the women, only phone records and pictures from their Dallas trip. Mother first learned of Father's belief that she and K.K. were having an affair when Father informed the Children that she had a lesbian lover. At the same time, Mother admitted she told the Children that Father was having an affair.

For her part, K.K. considered Mother a parental figure and a role model. She testified that she moved out of her parents' home and had stayed at Mother's home a few times while the Children were home. K.K. testified she was raped in college, became pregnant, and had a miscarriage. She and Mother shared many long conversations and Mother helped her through hard times and with class work. She denied saying anything to Mother about being suicidal, having mental health issues, or having a drug habit. She denied ever doing anything with Mother that she would not do in front of the Children except for becoming intoxicated on the Dallas trip. K.K. had accompanied Mother and the Children to Dollywood some seven times in the summer leading up to the trial.

-4-

Testimony from character witnesses indicated that Father was well respected by his peers and students. He was active at school and was especially a role model to his basketball players and "the troubled kids." Father had pictures of the Children all around his office at school and they were observed "hang[ing] all over him." Charlene Mobley, Father's mother, testified that, knowing her son as well as being an experienced day-care employee for many years, she was "flabbergasted" by the accusations that he abused the Children. She had seen only a close, loving relationship. Ms. Mobley added that she also loved Mother, felt she was a good parent, and supported her career ambitions with Mary Kay. Father presented a statement from the principal at Mother's school listing multiple instances when Mother was "written up" for being late and other violations at school. Mother attributed her tardiness to a sleeping disorder for which she said medications had been prescribed, while Father blamed it on her late-night talks with K.K.

Father expressed that he was best qualified to give the Children the care they needed in light of things currently happening in Mother's life. He admitted that when the oldest child was an infant, he had once woken up and shook her for a few seconds when she wouldn't stop crying, but he noted that he didn't harm her. He testified he had since learned how to parent the Children appropriately and how to tend to their needs. He was concerned that Wife was no longer able to properly supervise the Children because she was distracted with K.K., her phone calls, the Mary Kay business and other matters. The youngest child had recently suffered a burn to her back that had left a large scar when she and her sister were cooking. Father once brought the Children back home about 9:00 p.m. and observed K.K.'s car parked in the garage next to Mother's. He knocked on the door for nearly twenty minutes before Mother answered in her pajamas and with her hair disheveled.

Father regretted telling the Children that Mother was having a lesbian affair. He indicated that such behavior on his part was immature. If he received primary custody, Father intended to transfer the Children to a school in Etowah near his home. He said the school was larger with excellent test scores and teachers. He agreed that the oldest and middle child were at the top of their classes at their present school, also a top-rated school.

In its September 2010 final judgment, the court found both parties guilty of inappropriate marital conduct and declared them divorced. After completing the property division, the trial court focused on custody and parenting issues. Consistent with its judgment, the court entered a parenting plan that designated Father as the primary residential parent and provided equal residential time for each party.

B.

On July 28, 2011, Father filed a petition for contempt against Mother in which he asserted multiple violations of the provisions of the divorce judgment. Following a hearing, the court agreed. The court clarified or reiterated provisions respecting the summer residential parenting schedule and authority to make educational decisions. The court further dismissed two charges of contempt by Father against Mother regarding disputed time with the Children during the Christmas holidays and Halloween. The court found that Mother had committed six acts of willful contempt and sentenced her to ten days in jail for each count, for an effective sentence of sixty days in jail. Mother was further ordered to pay Father's attorney fees and the costs of the contempt proceeding. On Mother's motion to alter or amend, the court modified its order to find five counts of contempt with a corresponding sentence of fifty total days in jail. The court suspended the sentence. Mother filed a timely notice of appeal.

II.

Mother presents the following issues for our review:

> 1. Whether the trial court erred in designating Father as the primary residential parent.
>
> 2. Whether the trial court erred in ordering residential provisions without appropriate consideration for continuity and stability in light of the parents' employment schedules.
>
> 3. Whether the trial court erred by imposing a "paramour provision."
>
> 4. Whether the trial court erred in holding Mother in contempt and imposing an excessive sentence.

Father presents a single issue:

> Whether the trial court erred in not specifically approving the residential time set out in Father's proposed parenting plan.

-6-

III.

With regard to all issues, our review is de novo upon the record of the proceedings below. However, that record comes to us with a presumption that the trial judge's factual findings are correct. Tenn. R. App. P. 13(d). We must honor this presumption unless we find that the evidence preponderates against those findings. **Hass v. Knighton**, 676 S.W.2d 554, 555 (Tenn. 1984). There is no presumption of correctness with respect to the trial court's conclusions on matters of law, **Taylor v. Fezell**, 158 S.W.3d 352, 357 (Tenn. 2005), or on its application of the law to the facts, **State v. Thacker**, 164 S.W.3d 208, 247-48 (Tenn. 2005).

Trial courts are vested with broad discretion in framing parenting plans and choosing primary residential parents. **Parker v. Parker**, 986 S.W.2d 557, 563 (Tenn. 1999). We review such determinations under an abuse of discretion standard. **Id**. Under such a standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." **State v. Scott**, 33 S.W.3d 746, 752 (Tenn. 2000); **State v. Gilliland**, 22 S.W.3d 266, 273 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." **State v. Shirley**, 6 S.W.3d 243, 247 (Tenn. 1999).

"[A]n appellate court will review a trial court's contempt citation using the abuse of discretion standard." **Outdoor Mgmt., LLC v. Thomas**, 249 S.W.3d 368, 376-77 (Tenn. Ct. App. 2007). "[T]he award of attorneys' fees based upon a finding of contempt is also reviewed under the less stringent abuse of discretion standard and we will not modify a punishment imposed for contempt unless the complaining party can show that the trial court abused its discretion." **Id**.

"Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues." **Id.** (citing **McCaleb v. Saturn Corp**., 910 S.W.2d 412, 415 (Tenn.1995)).

IV.

A.

Wife challenges the trial court's decision to designate Husband as the primary residential parent. In particular, she asserts that the trial court failed to take into account the

importance of stability and continuity in the Children's lives and improperly focused instead on the alleged lesbian sexual relationship between her and K.K.

We proceed mindful that the "central concern in any custody and visitation ruling is the best interest of the children."*Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). "The interest of the parents are secondary." *Id*. Moreover, as this Court has further observed, "[b]ecause 'custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves,' appellate courts 'are reluctant to second-guess a trial court's decisions.' " *Id.* at 631.

"When both parties are seeking primary residential parenting status, courts determine the children's best interest by utilizing a comparative fitness analysis of each parent." *Burke v. Burke*, M2000-01111-COA-R3-CV, 2001 WL 921770 at * 2 (Tenn. Ct. App. M.S., filed Aug. 7, 2001). In considering which parent is best fit to serve as the primary residential parent, the courts are guided by the non-exclusive list of factors set out in Tenn. Code Ann. § 36-6-106(a)(2010), which provides as follows:

> (1) The love, affection and emotional ties existing between the parents and child;
>
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
>
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment. . . ;
>
> (4) The stability of the family unit of the parents;
>
> (5) The mental and physical health of the parents;
>
> (6) The home, school and community record of the child;
>
> (7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. [. . . .]
>
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there

are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

In the case at bar, the trial court made extensive findings on each of the factors relevant to its decision.[1] The court found that certain factors weighed equally in favor of Father and Mother, including "[t]he love, affection, and emotional ties existing between the parents and child;" "[t]he stability of the family unit of the parents;" and "[t]he mental and physical health of the parents." Tenn. Code Ann. § 36-6-106(a)(1), (4) & (5). The trial court expressly found two factors weighed in favor of Mother: "[t]he disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver," and "the importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment. . . ." Tenn. Code Ann. § 36-6-106(a)(2) & (3). In our view, the court implicitly weighed factor (6), the Children's "home, school and community record," at least slightly in Mother's favor when it noted that they had lived in the marital home, in the same community, and attended the same school where Mother taught all of their lives.

---

[1]Given their young ages, the court did not consider the Children's preference in this case. See Tenn. Code Ann. § 36-6-106(a)(7).

The court found that the remaining factors – (8), (9), and (10) – favored Father, particularly the latter two, which it weighed "strongly" in his favor. We quote pertinent portions of the trial court's findings:

> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. . . .
>
> [T]he court finds that both of these parties have been physically and/or emotionally abusive, one to the other. [T]his is completely inappropriate. The court has considered all of the testimony and evidence pertaining to [Mother's] allegations against [Father] that he has committed child abuse (sexual and/or physical abuse) against these three [C]hildren. [I]n each case, when [Mother] has made these allegations, . . . [they] have been properly investigated by the appropriate officials and/or agencies. . . .
>
>         \*     \*     \*
>
> In all cases, . . . these allegations have been found to be unfounded after an investigation was completed. The court takes judicial notice of the fact that after [Mother] made these allegations of sexual abuse against [Father], she allowed the [C]hildren to stay with [Father], unsupervised and overnight. Furthermore, . . . [Mother] has continued to allow liberal unsupervised visitation for [Father]. She proposed liberal unsupervised visitation going forward. The court finds [Mother's] allegations, and her actions and proposed parenting plan, are inconsistent. The court finds that [Mother's] testimony, regarding these allegations of sexual abuse by [Father] are not credible. The court finds, by a clear preponderance of the evidence, that [Father] is not guilty of any physical or sexual abuse related to any one of these three [C]hildren. The court finds that [Father] has been a loving, nurturing and supportive father for all three of these [C]hildren, and there is no credible proof that [Father] has committed child abuse. . . . Because of these unfounded, and what the court finds to be incredible allegations, and because of [Mother's] inconsistent actions, the court finds that factor eight weighs in favor of [Father].

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child. . . .

The court must address [Mother's] interactions with [K.K.] The court finds that [K.K.] has served as the [C]hildren's babysitter for some time now. [K.K.] frequently stays in the home, either with the [C]hildren and/or with [Mother]. [Father] testified that it is his opinion, based upon the evidence . . . that he provided to the court, that [Mother] and [K.K.] are having a lesbian affair.

\* \* \*

[Father's] stated desire, as reflected in his personal journal, was that [Mother] would show him the same attention and concern that she was openly showing for [K.K.]. On numerous occasions . . . [Father] states his desire that [Mother] would desire to spend the same amount of time with him as she was spending with [K.K.]. [Father] sets out . . . that [Mother] would often come home from work, work a few hours . . . or sleep, and then see to it that the [C]hildren were put in bed at their bedtime, and would then leave the home and go out on long walks with [K.K.], some lasting as long as 3-4 hours into the early morning hours. These walks happened on a regular basis. These walks and the amount of time that [Mother] was spending with [K.K.], was an obvious source of division and contentiousness in this marriage.

\* \* \*

The court was also provided with the account summary for [Mother's] cell phone for a 16-month period, beginning in January of 2009 through April of 2010. [T]he number of calls, the length of calls, and the time of day that the calls were made[] is extremely concerning to the court. The court finds that during 7 months of this . . . period, [Mother's] calls to or from [K.K.] are for periods in excess of 500 minutes per month. During . . . February 2010, [Mother] spoke with [K.K.] by phone for a period of 1,428 minutes (over 23 hours). [S]everal of the calls

-11-

. . . began at times as follows: 1:30 am, 1:53 am, 2:44 am, 5:12 am, 12:26 am. . . .

* * *

In April of 2009, [Mother] spoke with [K.K.] on the phone a total of 720 minutes. Some of these calls were as long as 101 minutes, 96 minutes, 68 minutes . . . .

* * *

[M]any calls were made and/or taken during school hours, apparently while [Mother] was working. In February 2010, [Mother] was on the phone for 263 minutes during school hours. In March 2010, 432 minutes during school hours. The court also received an exhibit . . . being the sworn statement of Stanley Shaddon, who is the Principal of Rural Vale Elementary School, where [Mother] teaches. Principal Shaddon sets out at least 12 events where [Mother] was late to school [and] an event where [Mother] came to work and left her students unattended. . . .

The court also received . . . pictures showing [Mother] and [K.K.] while on their trip to Dallas for a Mary Kay event. [Mother], [K.K.], and another individual . . . stayed in a hotel room together. [Mother] and [K.K.] shared the same bed. [K.K.] drew her name in a design on [Mother's] shoulder. [Mother] testified that this was done while both she and [K.K.] were intoxicated, and she was sleeping.

The court finds that the phone records, . . . pictures, . . . as well as the amount of time [Mother] has spent with [K.K.] . . . , are a clear indication that there is an inappropriate relationship by and between [Mother] and [K.K.].

* * *

The court finds that these calls, walks and late night visits, had a negative and adverse impact on [Mother's] job performance, and her personal home life and the home life of her husband and

-12-

[C]hildren. For whatever reason, [Mother] deemed her relationship and time spent with [K.K.] to be more important than most anything else during the 16 month period . . . as well as the months leading up until . . . this trial. Furthermore, the fact that [Mother] was staying in a hotel room and allowed herself, as well as a 19 year old girl, to become intoxicated to the point that she did not realize that the 19 year old was . . . drawing her name and designs on her shoulder, is of great concern to this court.

\* \* \*

The court strongly questions [Mother's] decision making ability as well as her state of mind. . . .

\* \* \*

Given all of the information and testimony that the court has, the court finds that the character and behavior of [K.K.], especially accompanied with the behavior of [Mother] around [K.K.], causes this court great concern. Because of these findings . . ., factor number 9 weighs strongly in favor of [Father].

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability . . . to facilitate and encourage a close and continuing relationship between the child and the other parent . . . .

The court finds that each parent shows the strong potential to carry out their responsibilities as parents. The court believes that each of these parents has a strong desire to be a good parent . . . and the court finds that each parent has the ability to be a good parent . . . . Both parents obviously love their [C]hildren. However, the court is extremely concerned about the willingness and ability of [Mother] to facilitate and encourage a close and continuing parent-child relationship between the [C]hildren and [Father]. [Mother], on more than one occasion, has filed very serious allegations against [Father] alleging sexual abuse related to these [C]hildren. [I]n each of these cases, her allegations have been unfounded , and the court does not find that her testimony

-13-

regarding these allegations in credible. [H]er later proposals, relating to [Father's] parenting time, are not consistent with these serious allegations. . . . [Mother] allowed the oldest child to take [Mother's] Ipod to [Father's] home. The child then recorded [Father] while he was in the shower. . . . The court finds that it is extremely troubling that a young child, . . . would be involved in taping her father while he was in the shower, and then the child later making allegations pertaining to sexual abuse and/or physical abuse, which were all later found to be unfounded.

* * *

The court finds that [Mother] has not shown a willingness, or an ability, to facilitate or encourage a close . . . parent-child relationship between these [C]hildren and [Father]. [T]he court finds that this factor weighs strongly in favor of [Father].

In the end, the trial court found that both Mother and Father loved, cared for, and had the potential and ability to properly parent the Children. The court concluded, however, that it was "in the best interest of these [C]hildren" for Father to be the primary residential parent. The court provided that in this role, Father had the final say as to educational decisions and other major decisions about which the parties could not agree.

It is evident to us that the trial court's consideration of factors (8), (9), and (10) ultimately tipped the scales in Father's favor. Our review of the record leads us to conclude that the trial court accurately summarized and carefully considered the proof at trial in light of these factors. We reject Mother's contention that the trial court based its ruling on the alleged sexual relationship between her and K.K. While the court acknowledged Father's belief of a sexual relationship, it made no such finding. Instead, the trial court found that Mother's devotion of so much of her time and attention to K.K. over all others in her life to be problematic and inappropriate, whatever the nature of that relationship. Equally troubling to the court was a complete lack of any evidence to support Mother's continuing allegations of sexual abuse by Father against the Children – allegations she raised for the first time upon filing for divorce. These allegations were never made an issue during discovery, pre-trial hearings, or Mother's proposed parenting plan. Moreover, the court expressly found that Mother's testimony regarding the sexual abuse allegations was not credible and, by a clear preponderance of the evidence, found Father committed no such abuse. The trial court's findings imply that it considered Mother's bald allegations of sexual abuse as nothing more than a thinly veiled attempt to improve her position at trial, a strategy that clearly backfired.

-14-

In short, the trial court properly applied a comparative fitness/best interest analysis in determining that Father should serve as the primary residential parent. The evidence does not preponderate against the trial court's findings. Nothing before us indicates that the trial court abused its discretion in designating Father as the primary residential parent as between these two parties.

V.

A.

In a related issue, Mother challenges aspects of the residential schedule in the court-ordered parenting plan. More specifically, Mother asserts that, in setting the co-parenting schedule, the trial court erred when it failed to take into account (1) Father's coaching responsibilities and (2) the importance of continuity and stability in the Children's lives, both at home and school. For his part, Father asserts that the trial court appropriately named him as the Children's primary residential parent, but that the court erred when it ordered a 50/50 residential parenting arrangement rather than granting him the "super majority" of parenting time he proposed. In this section, we address both parties' issues in turn. While it named Father as the primary residential parent, the court also found that "it would be in the [C]hildren's best interest to have as nearly as possible an equal, ongoing relationship with both of their parents." Accordingly, the court ordered that each parent would have the Children for a week at a time on an alternating weekly basis, plus one night per week during the week that the Children stayed with the other parent.

B.

On the first point, Mother submits that the court should have provided that she care for the Children during those times when Father's coaching duties – including supervising practices, attending games, and driving the team bus – prevented him from actively supervising the Children. She concludes that placing the Children under Father's supervision when he is unable to attend to them "places unnecessary stress on the [C]hildren. . . [and] benefits neither the [C]hildren nor either of the parents." On the second point, Mother submits that the court gave insufficient weight to the interactions that the Children had with each other, their teachers, and others in the only home and community they had ever known.

As this court has often recognized, "[p]arenting arrangements . . . [are] 'among the most important decisions confronting a trial court.'" *Coley v. Coley*, M2007-00655-COA-R3-CV, 2008 WL 5206297 at *4 (Tenn. Ct. App. M.S., filed Dec. 12, 2008)(citing *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (quoting *Rice v. Rice*, M1998-00973-COA-R3-CV, 2001 WL 812258, at *2 (Tenn. Ct. App. M.S., filed July

-15-

19, 2001); see also *Curtis v. Hill*, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006); *Shofner v. Shofner*, 181 S.W.3d 703, 715 (Tenn. Ct. App. 2004)). "The determination of a parenting arrangement is fact driven, and the trial court must consider all of the facts and circumstances involved in reaching its decision." *Id*. A court-ordered parenting arrangement must give primary consideration to the child's best interest as guided by a list of factors set out in Tenn. Code Ann. § 36-6-404(b)(2010).[2]

---

[2]The statutory factors include:

( 1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

( 2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

( 3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

( 4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

( 5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

( 6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

( 7) The love, affection, and emotional ties existing between each parent and the child;

( 8) The emotional needs and developmental level of the child;

( 9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(continued...)

-16-

Trial courts have broad discretion to make decisions regarding parenting arrangements, but those determinations must be made based on proof and applicable principles of law. *Chaffin*, 211 S.W.3d at 286; *D. v. K*., 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995). Given the discretion involved and the fact that the decision often hinges on witness credibility, "appellate courts are loathe to second-guess a trial court's conclusion." *Id*.

In the case at bar, the trial court found that both parties were fit, loving parents, but did not make specific findings as to the statutory factors it relied upon in fashioning the shared residential schedule. Under similar factual circumstances, this court concluded that the trial court's "decision to order equal residential time leads us to assume that the trial court found those factors to be in such balance between the parties that an equal division of residential time was warranted." *Coley*, at * 6. We reach the same conclusion in this case.

The proof shows that the Children have loving relationships with each of their parents, and both Mother and Father are fit, willing, and able to carry out their parental duties. Mother makes much of the fact that Father testified he was willing to give up his coaching position and the extra income if the Children were placed with him the majority of the time. This did not happen, however. As we see it, the trial court was well aware of each party's work schedules and availability to care for the Children when it made the 50/50 schedule rather than accepting either party's proposed parenting plan. Similarly, we reject Mother's assertion that the trial court did not give adequate weight to the "importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment." As noted, the evidence shows that the Children have always lived in the same

---

[2](...continued)

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. [. . . .];

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

home and attended the same school, where they were excellent students. In addition, they were active in church and in extracurricular sports activities and, by all accounts, were happy and well cared for by both Mother and Father. As we see it, there is every indication that the court took these circumstances into account when it decided that the Children would benefit most by remaining in their familiar surroundings as much as feasible while also giving them the benefit of having two good parents equally involved in their upbringing.

Based on the foregoing, as in *Coley*, "we decline to second-guess the court's conclusion that a 50/50 division of residential placement is in the best interest of the [C]hildren." *Id*. The trial court did not err in ordering a shared residential parenting schedule.

C.

As we have noted, Father raises his own issue concerning the residential parenting arrangement. He essentially contends that the trial court erred in failing to award him the majority of the residential time with the Children, with liberal visitation for Mother.

As we have discussed, Mother essentially requested that she be designated the primary residential parent, with liberal visitation for Father. Father, on the other hand, proposed just the opposite. At the close of the first day of trial, the court aptly advised the parties that "[t]hings don't stay normal in a divorce and in a child custody situation. Things are gonna [sic] change. . . ." In support of its parenting arrangement, the trial court found that both parties were abusive and acted inappropriately toward each other in front of the Children, but did not question their overall fitness, willingness, or ability to parent. Given all of the proof, the trial court determined that sharing equal time with each parent best served the Children. The court further ordered family counseling "with the aim of having the parents equally share in assisting in every way possible in the positive development of these [C]hildren. . . ."

In summary, the court found that "these [C]hildren need both of their parents to be equally engaged in their lives." The evidence does not preponderate against the trial court's finding.

VI.

Mother asserts that the trial court erred in including a traditional "paramour provision" in its decree. Mother argues that the provision limiting K.K.'s contact with the Children was not shown to be in their best interest and was made without proof that K.K.'s presence was harmful to them.

-18-

The challenged provision appears within the court's comparative fitness analysis of the parents in its custody determination. It follows the court's seven-page consideration of the "character and behavior of any other person who resides in or frequents the home of a parent . . . and the person's interactions with the child." *See* Tenn. Code Ann. § 36-6-106(a)(9). On the way to its finding that the cited factor weighed heavily in favor of Father, the trial court stated:

> As set out above, the court has great concern, concerning [Mother's] relationship and actions pertaining to [K.K.]. Based upon the testimony, the court finds that the [C]hildren's interactions with [K.K.] are a cause of concern to the court at this time and must be stopped or at a minimum, must be supervised by [Mother]. [K.K.] should not stay overnight with these [C]hildren present.

In response to Mother's issue with the trial court's directive that K.K. have limited, if any, contact with the Children, Father responds that Mother's challenge to a "paramour provision" is nothing more than a smokescreen – a misguided effort to make Mother's "sexual orientation or indications of a homosexual lifestyle" an issue despite no finding by the trial court to this effect. On our considered review of the entire record, we agree with Father.

At trial, the court heard extensive testimony from both parties as well as K.K. and others regarding Mother's and K.K.'s relationship. The court reviewed in detail the hundreds of phone calls between the two consuming thousands of minutes, their regular, long, late-night walks together – "some lasting as long as 3-4 hours into the early morning hours," Mother's lengthy visits to K.K. at college, and a trip the two took to Dallas during which they shared a hotel bed and were both intoxicated. Certainly, Father had come to believe that Mother and K.K. were engaged in a sexual relationship. For their part, however, both Mother and K.K. were adamant that they were not. In this regard, we find *Barker v. Chandler*, W2010-01151-COA-R3-CV, 2010 WL 2593810 (Tenn. Ct. App. W.S., filed June 29, 2010), upon which Mother relies, inapposite. In *Barker*, the mother began living with her partner in a same-sex relationship. The trial court included in a parenting plan a provision prohibiting any paramour of either parent from spending the night in that parent's home when the Children were present. On appeal, this Court held that the trial court abused its discretion in including the paramour provision absent any evidence "demonstrating that the paramour provision is in the best interests of the [C]hildren or that the presence of Mother's partner in the home has any harmful effect on the [C]hildren." *Id*. at *6.

Returning to the case at bar, the trial court made no finding of the nature of the relationship between Mother and K.K. The trial court did, however, make extensive findings reflecting its concern that the relationship, whatever it be, was clearly inappropriate considering nothing more than the sheer amount of time and attention Mother devoted to K.K. over her own family. Among its findings, the court observed:

> The court finds that the number of calls, the enormous number of hours spent on the phone . . . during the very early morning hours on such numerous occasions, are at a minimum, very concerning to this court, given the fact that this is a mother of three small [C]hildren who was, at the time, married and living with her husband. At a maximum, the court finds these calls, the number and extent, over such a long period of time, display a complete lack of concern for her [C]hildren and her husband, as well as a lack of appropriate concern for her job, and her famil[y's] finances . . . .
>
> *       *       *
>
> The court strongly questions [Mother's] decision making ability as well as her state of mind, given what the court has seen in the phone records, the pictures, and . . . the sworn written statement from [Mother's] employer/principal. [Mother's] actions have jeopardized her job, her [C]hildren, and her own well being.

In addition to Mother's interactions with K.K., the court was clearly concerned with K.K.'s character and her exposure to the Children. To this end, Father testified that K.K. had told him that she had experienced lesbian relationships while in high school, had attempted suicide more than once, and had used drugs in the past. The court found:

> Given all of the information and testimony that the court has, the court finds that the character and behavior of [K.K.], especially accompanied with the behavior of [Mother] around [K.K.], causes . . . great concern.

We reject Mother's position that the challenged language is a "paramour provision" aimed at a lesbian affair alleged by Father. Mother's protestations to the contrary, we interpret the trial court's remarks as one specific finding in support of its ultimate decision to designate Father the primary residential parent. Stated otherwise, in carrying out its best-interest analysis pursuant to Section 36-6-106(a), the trial court found that K.K.'s

overwhelming presence in and effect on Mother's life and theirs was not best for the Children. Accordingly, the court found that factor (9) weighed in Father's favor. We conclude that the trial court was within its authority to prohibit K.K. from having unsupervised contact with the Children and to caution against overnight visits with Mother in their presence. See, e.g., *Stogner v. Stogner*, M2011-00503-COA-R3-CV, 2012 WL 1965598 at *3 (Tenn. Ct. App. M.S., filed May 31, 2012)(noting that the "determination of the best interest of the child is an independent responsibility of the court" and upholding an injunction prohibiting all contact by a friend of the mother with the parties' child as harmful to the well-being of the child and the father/child relationship.). The evidence does not preponderate against the trial court's findings, and the court did not abuse its discretion by restricting K.K.'s contact with the Children.

VII.

A.

Mother challenges the trial court's order holding her in contempt and punishing her accordingly. She asserts that (1) there is insufficient evidence to support a finding of willful contempt and (2) the sentence is excessive.

Pursuant to Tenn. Code Ann. § 29-9-102(3)(2012), contempt of court includes the willful disobedience of "any lawful . . . order, rule, decree, or command." The statute may be the basis for punishment of either civil or criminal contempt. *Flowers v. Tennessee Trucking Ass'n Self Insurance Group Trust*., 209 S.W.3d 602, 613 (Tenn. Ct. App. 2006). "After a finding of contempt, courts in Tennessee have several available remedies." *Ahern v. Ahern*, 15 S.W.3d 73, 79 (Tenn. 2000). When a court imprisons and/or fines an individual simply as punishment for the contempt, this remedy is commonly referred to as "criminal contempt." *Id*. "Criminal contempt convictions are punitive in character, and their primary purpose is to vindicate the court's authority." *Thigpen v. Thigpen*, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993). As a remedy for criminal contempt, the circuit, chancery, and appellate courts are limited to imposing a fine of $ 50.00 and to imprisoning an individual for not more than 10 days, unless otherwise allowed. See Tenn. Code Ann. § 29-9-103.

B.

Following a hearing, the trial court found that Mother had willfully violated five provisions of the divorce judgment. We begin by setting out the relevant portions of the judgment, and the related evidence supporting the findings in turn.

In the present case, the court ordered family counseling. The judgment states:

-21-

> The court orders that these parties shall agree upon a parenting coordinator/family counselor within thirty (30) days from the date of entry of this order. The court further orders that the parents shall meet with this parenting coordinator/family counselor at least monthly, for a minimum period of twenty-four (24) months or for so long as the parenting coordinator/family counselor shall deem it necessary after 24 months.

> \* \* \*

> Failure to attend and actively and eagerly participate in this family counseling will be a direct violation of this order.

Both parties also point to the parenting plan, which provides that the parties shall jointly make "major decisions," including "non-emergency health care" decisions concerning the Children. The plan provides that Father, as the primary residential parent, shall be the "tie breaker" if the parties cannot agree on any "major decisions."

Following the contempt hearing, the court found that Mother violated this provision as follows:

> [W]ith regard to the counselor of the [C]hildren, [Mother] has[,] on her own, gone to [a counselor of her choosing], for the [C]hildren, without informing [Father] of such. . . ;

The proof at the contempt hearing showed that the parties agreed to a counselor, Cindy Ensminger, and actively participated in counseling with her as ordered beginning around February 2011. The proof showed that from the time the judgment was filed in September 2010, however, up until the agreed counselor was chosen, Mother took the Children to a counselor she herself had seen and to whom Father objected as the choice for the court-ordered counseling. After counseling with Ms. Ensminger began, Mother also took one child to another counselor without advising Father until after the fact.

The court-ordered parenting plan provides that "major decisions" concerning "extracurricular activities" shall be jointly made by the parties. Again, the plan further states: "If parents unable to agree[,] Father will be tie breaker. . . ." The court found that Mother violated this provision as follows:

> [A]s it relates to certain school and/or extracurricular activities . . . [Mother] has made unilateral decisions . . . that she has not

made [Father] aware of . . . in direct violation of the plain language of the Court's order. . . ;

At the hearing, Mother admitted that she registered all three Children for soccer in Tellico Plains and registered one child for a basketball camp on her own, without first consulting with Father. Thereafter, when Father agreed to take the child to the camp, he learned on his arrival that Mother had paid only half the registration fee. Father testified he didn't object to the camp itself, but that he "didn't know about it ahead of time."

The decree awarded certain items to Father as follows:

> With regard to the linens (all sheets and blankets), the court finds that these items shall be equally divided with one person choosing one item then the other person choosing one, until the items are equally divided. With regard to the video camera and the Wii console, the court finds that these items shall be with the [C]hildren and shall follow the [C]hildren as a general rule. With regard to the pressure washer, the court finds that this shall be the property of [Father]. Finally, the court finds that the framed wedding portrait shall be divided as follows: the portrait to [Father] and the frame to [Mother]. All other items of personal property have already been divided and/or discussed as set out during the court proceeding.

The record reflects that by the time of trial, the parties had agreed to the division of much of their property. At trial, they agreed that the "Children's items," including the video camera, the gaming console, and "whatever is the [C]hildren's," would go where the Children go. Presumably, this included their clothing. The pressure washer was disputed and awarded to Father. The external hard drive was not discussed but is listed on the exhibited master asset list as Father's separate property. Other than those ornaments that Mother was given as collectibles by her family, the court ordered that the Christmas decor be divided between the parties.

At the contempt hearing, Mother testified that Father never asked for the video camera and she never gave it to him, nor had she spoken to her parents about the pressure washer that was in their possession. She testified she had divided and given Father half the Christmas ornaments and the linens. She had not figured out how to wipe her own personal information off the computer's external hard drive so that she could turn it over to Father. In general, Mother testified she had tried to comply with the court's order to the best of her ability. Father said Mother had basically taken the position that "what's in [her] home stays in [her]

home" despite what the court ordered. Father testified he tried to retrieve the items he was awarded without success. Mother told him the video camera was broken, so it never "followed the Children." She told him half the pressure washer belonged to her parents and they would have to let the court address that item again. Father testified to his understanding that "any of those things that we're supposed to split, like the Christmas stuff, linens, I was supposed to pick one, she was supposed to pick one. We never did anything like that." Instead, "[M]other gave [him] all of the junk out of her linen closet." Father said Mother had only recently allowed the Children to bring some of their clothing when they came to his house. The court found Mother in contempt of its order as follows:

> [T]he Final Decree is very clear as to the property that [Father] was to receive, which was not followed by [Mother], and the Court finds such was done at [Mother's] personal discretion . . . . [W]ith regard to the video camera, pressure washer, the external hard drive, the Christmas decor and kid's clothing, the Court finds [Mother] made a unilateral decision to ignore the Court's order. . . .

The court found Mother in contempt of two provisions of its decree addressing K.K.'s contact with the Children going forward. The challenged provisions state:

> [T]he court finds that the [C]hildren's interactions with [K.K.] are a cause of concern to the court at this time and must be stopped or at a minimum, must be supervised by [Mother]. [K.K.] should not stay overnight with these [C]hildren present.

The court found Mother violated both provisions as follows:

> The Court finds that the allowing of "[K.K.]" to take one of the [C]hildren to the dentist or anywhere else, unsupervised, is 100% in violation of the Court's order. . . .

> The Court finds . . . that "[K.K.]" has in fact stayed overnight in the same bed with [Mother] in the presence of the [C]hildren and that the Court order has therefore been violated. . . .

At the contempt hearing, Father testified that he learned through marital counseling that K.K. had stayed at the marital home while the Children were present. In response to Mother's answer, in which she stated that K.K. stayed in a room above the detached garage, Father testified the room was not habitable. It had no heat or air, no electricity, no walls, no

furniture and no flooring. Mother testified that the one and only time K.K. had been with the Children unsupervised was when K.K. had taken one child to the dentist. Regarding overnight stays, Mother understood the court's decree to state "it wasn't prohibited, that it should never happen . . . ." K.K. testified that since March 2011, she had stayed at Mother's home, in a room over the garage, about thirty percent of the time. On one trip with Mother and the Children, she had stayed in a motel and shared a bed with Mother in the Children's presence. The court expressly found that testimony of K.K. and Mother to the effect that K.K. stayed in a room over the detached garage, not inside Mother's home, was "incredible and incorrect."

C.

"There are four essential elements of a contemptuous violation of a court order or command." ***Ross v. Ross***, M2008-00594-R3-CV, 2008 WL 5191329 at *5 (Tenn. Ct. App. M.S., filed Dec. 10, 2008) (citing ***Konvalinka v. Chattanooga-Hamilton County Hosp. Auth***., 249 S.W.3d 346, 354-55 (Tenn. 2008)). "The order alleged to have been violated must be "lawful," the order alleged to have been violated must be "specific and unambiguous," the person alleged to have violated the order must have actually disobeyed the order, and that person's violation of the order must have been "willful." ***Id***. In this appeal, as to each of five contempt citations, Mother asserts that the judgment was not specific and her violations were not willful. We therefore focus on the second and fourth elements.

We first consider the specificity of each of the challenged provisions. To support a finding of contempt, "the court order that was allegedly violated must have 'specifically mandated or prohibited' the alleged contemptuous conduct." ***Outdoor Mgmt., LLC***, 249 S.W.3d at 377. We have carefully reviewed each of the five provisions in light of the entire record – that is, the circumstances surrounding the entry of the provisions – and the court's final judgment, including the incorporated parenting plan. On our review, we conclude that the court's orders are specific and unambiguous with respect to all of the five pertinent provisions.

Succinctly summarized, the court's judgment mandated joint decision-making as to major non-emergency health care and extracurricular decisions; mandated that certain items of property be given to Father or be transferred back and forth with the Children; and prohibited K.K. from having unsupervised contact with the Children. In our view, the judgment with respect to these provisions specifically informs Mother what actions she must take and what actions are prohibited. As to the provision that "[K.K.] should not stay overnight with these [C]hildren present," we conclude that it is specific and unambiguous.

We next consider whether Mother's conduct was "willful." Generally stated, conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he is a free agent, knows what he is doing, and intends to do what he is doing. *Flowers*, 209 S.W.3d at 612. "In the criminal context, a willful act is one undertaken for a bad purpose." *Konvalinka*, 249 S.W.3d at 357. It can also mean "a thing done without ground for believing it is lawful; or conduct marked by careless disregard whether or not one has the right so to act. . . ." *State v. Casper*, 297 S.W.3d 676, 687-95 (Tenn. 2009) (quoting *Bryan v. United States*, 524 U.S. 184, 191 n.12, 118 S. Ct. 1939, 141 L. Ed. 2d 197 (1998)).

Our review of the parties' testimony at the contempt hearing convinces us that Mother's conduct was indeed willful. In short, Mother intentionally made major, unilateral decisions regarding the Children, failed to effectuate the division of the parties' property as ordered, and allowed K.K. to care for at least one of the Children unsupervised. Mother had no real explanation for her actions, except to say that she once allowed K.K. to take one child to the dentist because she was more concerned with keeping the appointment than with the order prohibiting K.K.'s unsupervised contact with the Children. We think Mother acted with the "bad purpose" that she would make whatever decisions she chose to make regarding the Children, the property, and K.K. regardless of the court's orders or Father's opinions to the contrary. Certainly, nothing in the court's orders or the circumstances surrounding their entry gave Mother any reason to believe she was authorized to act as she did. Based on the foregoing, the contempt citations are affirmed.

D.

For her contemptuous acts, the trial court sentenced Mother to ten days in jail on each count. Following a hearing on Mother's motion to alter or amend, the court suspended service of her sentence "so long as [Mother] does not violate Court orders and if she violates such, she will serve the appropriate contempt sentence for the particular violation" as originally imposed. As a further sanction, the court entered a judgment against Mother for $2,500 for payment of Father's related attorney fees. Mother submits that her actions, if contemptuous, do not warrant consecutive sentences or cumulative fines for each count.

In the present case, we have affirmed the citations against Mother for criminal contempt of the court's judgment. As we noted earlier, the trial court ordered the sentences suspended pending any further violation of the corresponding provisions by Mother. The Supreme Court has observed that "criminal contempts are 'intended to preserve the power and vindicate the dignity and authority of the law, and the court as an organ of society.' " *Doe v. Board of Professional Responsibility of the Supreme Court of Tennessee*, 104 S.W.3d 465, 474 (Tenn. 2003)(quoting *Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996)). "Punishment for criminal contempt is both punitive and unconditional in nature and serves

to adjudicate 'an issue between the public and the accused.' " *Id*.  The record and circumstances surrounding the contempt citations do not lead us to conclude that the sentence imposed is excessive.  Accordingly, we decline to exercise our discretion to reduce or modify the sentence.

Lastly, we address the award of Father's attorney fees in the contempt proceeding. As a general rule, attorney's fees are not allowed to the prevailing party on a criminal contempt petition because the award of fees is viewed as punishment in excess of the $50 fine and 10 days in jail allowed under Tenn. Code Ann. § 29-9-103 (2012). See ***Butler v. Butler***, No. 02A01-9409-CH-00218, 1995 WL 695123 at *2 (Tenn. Ct. App. W.S., filed Nov. 21 1995).  Moreover, appellate courts may modify a sentence for contempt when they appear to be excessive.  See ***Thigpen***, 874 S.W.2d at 54.  For these reasons, in the case at bar, we reverse the trial court's award of $2,500 to Father for his attorney's fees on the contempt proceeding.

## VIII.

The judgment of the trial court is reversed in part as set forth in this opinion.  In all other respects, the judgment is affirmed.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment as affirmed by this opinion. Costs on appeal are taxed to the appellant, Carrie Mobley.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE